KEARNEY & TRECKER CORPO-
RATION, Plaintiff,

v.

CINCINNATI MILACRON, INC., and
Cincinnati Milacron Company,
Defendants.

Civ. A. Nos. 6019, 6146.

United States District Court,
S. D. Ohio, W. D.

Oct. 17, 1975.

William Marshal Lee, Chicago, Ill., and C. Jackson Cromer, Cincinnati, Ohio, for Cincinnati Milacron, Inc.

## AMENDED OPINION

DAVID S. PORTER, District Judge:

These are consolidated actions in which plaintiff charges the defendant with infringement of patents on automatic tool changers important to automation in the machine tool industry. In such actions the defendant in its amended answer asserts the defense of collateral estoppel and in a counterclaim charges plaintiff with antitrust violations and seeks declaratory judgment that plaintiff's patents in suit are invalid, not infringed, and unenforceable. The jurisdiction of the Court is not contested.

Plaintiff, Kearney & Trecker Corporation (a Wisconsin corporation), is engaged primarily in the manufacture and sale of machine tools. The defendant, Cincinnati Milacron, Inc., and its wholly owned subsidiary Cincinnati Milacron Company (herein referred to collectively as defendant or as "Cincinnati"), are Ohio corporations, also engaged primarily in the manufacture and sale of machine tools.

The patents charged to be infringed are Morgan Re. 25,812,[1] and Brainard, et al., Re.-Re. 25,737.[2] In its original complaint the plaintiff claimed that still another patent [3] was infringed. In the course of discovery in this litigation and similar litigation involving the Brainard patent in the Eastern District of Wisconsin, it came to light that after issuance of the Brainard patent plaintiff had employed as a consultant Thomas Emmert Beall, formerly the Primary Examiner of the Division of the Patent Office to which the Brainard patent had been assigned. As such consultant for

Edward A. Haight, Chicago, Ill., Thomas W. Ehrmann, Milwaukee, Wis., and Thomas S. Calder, Cincinnati, Ohio, for Kearney & Trecker Corp.

1. Morgan No. 2,901,927, issued Sept. 1, 1959, entitled "Automatic Machine Tool" (reissued June 29, 1965 as Re. 25,812).

2. Brainard, et al., No. 3,052,011, issued Sept. 4, 1962, entitled "Machine tool with mechanical cutting tool changer" (reissued May 26, 1964, as Re. 25,583 and re-reissued March 2, 1965 as Re.-Re. 25,737).

3. Brainard, et al., No. 3,099,873, issued Aug. 6, 1963, entitled "Shuttle operated tape controlled machine tool."

Kearney & Trecker, Beall worked on the reissue and re-reissue of the Brainard patent, the prosecution of the shuttle patent (No. 3,099,873) and the acquisition and reissue of the Morgan patent. This raised a question of fraud on the Patent Office (conflict of interest) and, on the advice of its trial counsel, plaintiff disclaimed the shuttle patent and reduced its charge of infringement to certain claims in the reissued Morgan patent and the re-reissued Brainard patent which had been carried forward from the original patent. These curative efforts were temporarily successful. The District Court for the Eastern District of Wisconsin found the Brainard patent valid, infringed, and, most importantly, enforceable. *Kearney & Trecker Corporation v. Giddings & Lewis, Inc.*, 306 F. Supp. 189 (E.D.Wis.1969). The case before this Court (except the issue of damages) came on for trial in 1970 after five years of exhaustive discovery. After it was submitted this Court held up, pending the outcome of the appeal of the *Giddings & Lewis* case, *supra*. The Court of Appeals for the Seventh Circuit reversed, finding that the Brainard patent was unenforceable, that there was an antitrust violation on the plaintiff's part, and that this was a proper case for attorney's fees. *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F. 2d 579 (7 Cir., 1971), cert. den. 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).

Thereafter defendant was permitted to amend its answer herein and assert the additional defense of estoppel by judgment. The record was made up on this, and the case was finally submitted late in 1972. The issues of estoppel and conflict of interest overshadow the others in the case and will therefore be considered first. In that connection there will be a description of the industry and the plaintiff's machines. But before passing to that, a statement about the procedural background of this case, the patents, their success, and the events leading up to this litigation is in order.

This litigation began with the filing in this Court of Case No. 6019 by defendant on September 14, 1965, seeking a declaratory judgment that the patents in suit were invalid and not infringed by Cincinnati's accused machine. Six days later the plaintiff, Kearney & Trecker, filed Case No. 65–C–1575 in the United States District Court for the Northern District of Illinois, Eastern Division, charging infringement of the patents in suit and one other. The latter proceeding was stayed and, after extensive proceedings, eventually transferred to this Court. *Kearney & Trecker Corporation v. Cincinnati Milling Machine Company*, 254 F.Supp. 130 (N.D. Ill., E.D., 1966).

As to the patents still in suit, the Morgan patent was originally issued September 1, 1959, as U. S. Patent No. 2,901,927, on an application filed December 27, 1957. It was assigned by the inventor to his employer, IBM. Plaintiff purchased it from IBM under an agreement affective April 1, 1963, and since that time has been the record owner by assignment of the patent. On January 17, 1964, plaintiff filed an application for a reissue of the patent, and Reissue Patent Re. 25,812 was granted to it by the Patent Office on June 25, 1965.

The Morgan patent discloses a jig boring machine with an automatic tool changer under numerical control, the details and development of which will be gone into later. Suffice it to say here that the machine was the first with a fully automatic programmed selection of a tool from storage, means for positioning and securing the selected tool in the spindle, and removal of the tool from the spindle and return to storage.

The application for the original Brainard patent was filed June 27, 1958, by Wallace E. Brainard and four others of the plaintiff's employees as joint inventors. Patent No. 3,052,011, (containing claims 1 through 35), issued on this application on September 4, 1962. Application for reissue was filed September 23, 1963, and Patent Re. 25,583 is-

sued thereon on May 26, 1964, (adding claims 36 through 47). Application to again reissue the patent was filed August 28, 1964, and patent Re.-Re. 25,737 was issued thereon on March 2, 1965, (adding claims 48 through 60).

Plaintiff is and at all times has been the sole owner of Brainard Re.-Re. 25,-737, and was at all times total owner of patents Re. 25,583 and 3,052,011, prior to their surrender to the patent office at the time of re-reissue.

Brainard disclosed a more sophisticated machine than Morgan and included several "firsts." If not the first, it was the best machine to fill the need for a multi-purpose machine tool under numerical control with an automatic tool changer. It was the first to provide for bodily removal of a tool from storage, and the first to provide for simultaneous exchange of such selected tool with the tool in the spindle and placing the tool removed from the spindle in the place in the storage drum from which the new tool was just removed. It was also the first to enjoy commercial success.

The defendant first became aware of such success in 1958–59 when it received a request from Westinghouse Electric Corporation in Pittsburgh—or an inquiry—as to what defendant had which compared to the Milwaukee-Matic line of Kearney & Trecker[4] (r. 637, et seq.; px. 185, 186, 187, 188). Cincinnati, the largest manufacturer of machine tools in the United States, though not a giant corporation by modern standards, was caught short, as it was preoccupied with the development of other machines. As will be seen later in this opinion, as a result of this inquiry from Westinghouse, Cincinnati came under extreme pressure to come up with a machine or machines to compete with the Milwaukee-Matic machine. Their own reports showed the enthusiasm for Kearney & Trecker's tool changing machine was almost "indescribable" (px. 76). A workpiece which had previously taken eleven hours to machine was being done in less than three on the Milwaukee-Matic, and the set-up time previously measured in hours was cut to minutes (r. 117).

Cincinnati developed its "ATC" line to compete with Kearney & Trecker's Milwaukee-Matics and first offered this line for sale in 1962 (r. 469–479; px. 152–161); its CIM-Xchanger line was offered in 1968 (r. 486–494; px. 167–175); and its Cintimatic tool changer line was first offered for sale in 1969 (r. 508–10, 517–522; px. 178–184). Cincinnati never took a license under the Brainard patent and was appropriately put on notice by Kearney & Trecker. When Cincinnati did not respond this lawsuit followed.

## I.

## COLLATERAL ESTOPPEL

In support of its position that the plaintiff was estopped from asserting patent infringement by the Seventh Circuit decision in Giddings & Lewis, supra, defendant relies on *Blonder-Tongue v. University Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). In that case the Court overruled *Triplett v. Lowell*, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936), and held that a defendant in a patent case could assert estoppel by judgment if the validity of the same patent had been previously litigated by the same plaintiff or one with whom he was in privity, and found invalid. The Supreme Court moved into this specific area of patent invalidity after a review of the entire doctrine of mutuality of estoppel, recognizing that:

"Undeniably, the court-produced doctrine of mutuality of estoppel is undergoing fundamental change in the common-law tradition." 402 U.S. at 327, 91 S.Ct. at 1442.

The Court said:

"Obviously, these mutations in estoppel doctrine are not before us for

---

4. "Milwaukee-Matic" is Kearney & Trecker's trade name for the line of machines covered by the Brainard patents.

wholesale approval or rejection. But at the very least they counsel us to re-examine whether mutuality of estoppel is a viable rule where a patentee seeks to relitigate the validity of a patent once a federal court has declared it to be invalid." *Id.*

At the outset of our consideration of defendant's claim of collateral estoppel, we concluded a factual distinction exists between the present case and that in *Blonder-Tongue*. *Blonder-Tongue* involved a prior adjudication of patent invalidity, whereas in the instant case, the prior adjudication was that plaintiff's patent was unenforceable because of inequitable conduct. Plaintiff here urges that in such a situation *Blonder-Tongue* is inapplicable, citing *Grantham v. Mc-Graw-Edison Company*, 444 F.2d 210 (7 Cir., 1971).

In *Grantham* the question was whether a patentee who had granted another an exclusive license to practice his invention could bring suit against an infringer. Plaintiff's suit had been dismissed below on the ground that plaintiff lacked capacity to sue because he had assigned all his substantial rights. The same plaintiff had filed an earlier suit in another Circuit against a different infringer, and such action had been dismissed on the ground that he lacked capacity to sue. The defendant urged that the prior determination estopped plaintiff from suing again, but the Seventh Circuit rejected the argument, saying that estoppel by judgment must be mutual, relying on *Triplett v. Lowell, supra*.

After *Blonder-Tongue* was decided the defendant in *Grantham* petitioned for a rehearing in view of the fact that *Blonder-Tongue* overruled *Triplett*, at least in part.

In its opinion denying the rehearing petition, the Seventh Circuit did not change its position on estoppel by judgment. After noting the defendant failed to raise the defense in the District Court, the Court of Appeals stated that *Blonder-Tongue* overruled *Triplett* only

to the extent that *Triplett* does not permit a plea of estoppel where there is a prior determination of invalidity. The Court went on to say:

"... That holding does not reach this case where there has never been a determination of the validity of the Granthams' patents; and we do not believe that this is a proper case for the extension of *Blonder-Tongue's* abrogation of the mutuality requirement to situations where there has not been a prior determination of patent invalidity." 444 F.2d at 217.

As we read *Grantham* we conclude that the Court's sense of justice and equity governed the exercise of the discretion to which the estoppel by judgment question was addressed. In other words, we sense that the Court in *Grantham* may have felt that an injustice had been done to the plaintiff when he was found to be without standing and we feel that factor entered into the decision not to apply or extend the doctrine of *Blonder-Tongue*. In any event, since we were not bound by *Grantham*, we looked for a decision of the Court of Appeals for the Sixth Circuit on mutuality of estoppel. Finding none at the time of our decision on defendant's motion to amend its answer (since that time *Wahl v. Vibranetics, Inc.*, 474 F.2d 971 (6 Cir., 1973), was decided, about which we will have more to say presently), we went to the decisions of other Circuits and found a distinct federal posture antipathetic to the mutuality doctrine. Thus, while 1B J. Moore, Federal Practice, § 0.412, p. 1806 (2d Ed.) favors retention of mutuality of estoppel, the author states in the 1973 Cumulative Supplement relating to that page:

"Admittedly, the trend in the federal courts is away from the rigid requirements of mutuality advocated herein."

In *Rachal v. Hill*, 435 F.2d 59 (5 Cir., 1970) and *Lynne Carol Fashions, Inc. v. Cranston Print Works, Co.*, 453 F.2d 1177 (3 Cir., 1972), both Courts recognize a distinct federal rule that the requirements of mutuality need not be met

in order for collateral estoppel to be applied in an action presenting a federal question in a federal court. In light of all of the foregoing, we concluded that *Grantham* was not controlling here, and that defendant should be permitted to assert the defense of collateral estoppel. We found no laches in asserting such defense, since the motion was made promptly after denial of certiorari in *Giddings & Lewis, supra.*

While we permitted assertion of the defense, it must be observed that collateral estoppel does not automatically bar plaintiff's claim. Instead defendant must establish that the case is one where the doctrine should be applied. We are brought back to *Blonder-Tongue* for enlightenment as to when federal courts will apply the doctrine.

In *Blonder-Tongue, supra,* 402 U.S. at 323, 91 S.Ct. 1434, the Court pointed out that the beginning of the end of mutuality of estoppel began in the California decision *Bernhard v. Bank of America National Trust and Savings Association,* 19 Cal.2d 807, 122 P.2d 892 (1942). In *Bernhard,* Justice Traynor rejected the doctrine of mutuality and listed three criteria for the application of *res judicata:*

"Was the issue decided in the prior adjudication identical to the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?" *Id.,* at 813, 122 P.2d 895.

We conclude the Supreme Court in *Blonder-Tongue* approved these criteria.

We noted above that since our decision to permit the assertion of the defense of collateral estoppel, the Court of Appeals for the Sixth Circuit decided *Wahl v. Vibranetics, Inc.,* 474 F.2d 971 (1973). *Wahl* was a direct application of *Blonder-Tongue* in that the first trial was one in which the patent was held invalid because the invention was found to be anticipated and obvious. Even so,

the *Wahl* Court, after quoting at length from *Blonder-Tongue,* said:

"It is apparent from these quotations that there must be something more than proof of *existence* of prior litigation of the same patent, resulting in an adjudication of infringement, before a patentee may be foreclosed from trial of a subsequent action involving the same patent. Under the principles announced, necessarily, there must be a balancing of the equities on a case by case basis." 474 F.2d, at 974. [Emphasis in original.]

This holding is consistent with the Restatement criteria alluded to above, approved in *Blonder-Tongue,* and adds to our direction that in deciding whether collateral estoppel applies there must be a balancing of the equities on a case-by-case basis. We conclude this portion of our discussion with the following quotation from *Blonder-Tongue, supra,* 402 U.S. at 334, 91 S.Ct. at 1445:

" . . . [The] decision [as to estoppel by judgment] will necessarily rest on the trial courts' sense of justice and equity."

In the exercise of the discretion to which the question is addressed and with the above criteria in mind, the Court concludes that plaintiff should not be estopped. There are several reasons.

First and foremost, it would be manifestly unjust in this case after the extensive litigation and great expense to the plaintiff, to be estopped from relitigating the main patent in suit, Brainard, et al., Re.-Re. 25,737, because of the Seventh Circuit's holding that it is unenforceable on grounds of fraud on the Patent Office. This lawsuit was already tried and submitted before the Seventh Circuit decision was announced. Hence, there would be no saving in judicial time which would result if the plaintiff was estopped, except for the relatively small amount of time it will take to decide the merits of the case.

Next, *Blonder-Tongue* was based in part on the extreme desirability of avoiding relitigation of technical matters. The conflict of interest question is not technical in nature. In *Blonder-Tongue* the patent owner was estopped to assert *validity*. *Giddings & Lewis* involved enforceability.

Next, the plaintiff has demonstrated that the Seventh Circuit decided the case in part on consideration of documents which were ruled inadmissible by the District Court and which the plaintiff therefore had no chance to rebut. We note the defendant's contention that such documents related only to the Morgan patent. It is clear, however, that conduct in regard to that patent entered into the reasoning of the Seventh Circuit leading to its decision on the misconduct defense.

Finally, the decision on the broad issue of enforceability of plaintiff's Brainard patent was on a legal ground not raised by either party to the appeal nor briefed by either party, at least not in the briefs filed prior to the decision of the Seventh Circuit. Neither were they argued by either party.[5]

The doctrine of collateral estoppel therefore loses its appeal in a case such as this. In sum, we conclude that on balance it would simply be inequitable at this point in this lawsuit to say to the plaintiff that it cannot continue to attempt to enforce Re.-Re. 25,737.

Plaintiff acknowledges that the record before this Court on the issue of fraud on the Patent Office is complete (plaintiff's brief on collateral estoppel, p. 12).[6] While plaintiff's counsel indicates that issue is only one of many which must be decided by the Court, we view it as second in importance to the one next to be considered, whether the claims in suit, which were carried forward from the

original Brainard patent into Re.-Re. 25,-737, are unenforceable against the defendant. Such claims were not found invalid by the Seventh Circuit and District Judge Gordon found them valid. This Court also finds them valid. The claims relate to the tool changer, and it is this which is central to the success of Kearney & Trecker's Milwaukee-Matic II which "put it all together" as far as such multi-purpose numerically controlled machine tools are concerned. While we conclude herein that such patent is valid, such holding will be of small comfort to the plaintiff if it is unenforceable because of fraud on the Patent Office.

## II.

## FRAUD ON THE PATENT OFFICE (CONFLICT OF INTEREST AND FRAUDULENT PROCUREMENT)

*Introduction*

In approximately half of the 600 patent suits filed each year, the defense of fraud on the Patent Office is asserted. 15 Idea: The Patent, Trademark & Copyright Journal of Research and Education 619, at 681 (1971). Such fraud can arise from a conflict of interest as well as from other sources, and there is a claim in this case that it does. There is a mass of material on this issue which, in order to get in perspective, needs to be viewed alone and in combination with certain facts which relate to other issues in the case.

*Conflict of Interest—Facts*

The facts on conflict of interest were fully developed, just as they were in *Giddings & Lewis, supra,* because in both cases the enforceability of the original Brainard patent claims in suit is an issue. We must fully recount these facts, as did the Court in *Giddings &*

---

5. The documents referred to above were admitted into evidence in this Court (dx 1019, 918, 910 and 921) and plaintiff had a chance to rebut them.

6. While plaintiff may not acknowledge it had a full and fair opportunity to litigate the issue of enforceability of the original Brainard claims in *Giddings & Lewis,* supra, the record on that issue is as complete in that case as it is in this one.

*Lewis,* including a description of the industry; the patents in suit; plaintiff's machines; what defendant did when it learned about plaintiff's machines; the prosecution of the original Brainard patent; Examiner Beall's connection therewith; the nature of Beall's services to plaintiff after his retirement from the Patent Office; and the corrective steps taken by plaintiff to cure any possible patent misuse.

The industry is described by Judge Stevens in *Giddings & Lewis,* 452 F.2d at 581, as follows:

"The parties manufacture automatic machine tools which can perform a variety of machining operations, such as milling, boring, drilling, threading and reaming. For each operation, the exact location, diameter and depth of the hole to be machined in the workpiece are predetermined and defined by a numerical code which can be translated into perforations on tape or cards. The operations are thus controlled 'numerically.' The concept of numerical control of machine tool operations became commercially important in the early 1950s.

"The parties use numerical control, not merely to direct specific operations automatically, but also to control a sequence of operations and the selection of the specific tool needed for each operation. Their machines employ automatic tool changers . . . .

"Since a sequence of operations normally requires the use of a variety of tools, the time required to effect a tool change has a direct and significant impact on costs; the efficiency of the tool changer is, therefore, of vital importance. Plaintiff's automatic tool changer was not the first to be developed, but apparently it is the best.

"Plaintiff's 'Milwaukee-Matic' machines were introduced in 1958 and first sold in 1959; sales increased each year through 1967 when volume exceeded $36,000,000. During those years, plaintiff's sales of Milwaukee-Matic exceeded $150,000,000 compared to competitors' sales of between $75,000,000 and $100,000,000. Moreover, in 1968 plaintiff received approximately $573,000 of royalty income from its Brainard patent. It was a commercial success.

"Plaintiff's machines were sold in different models and sizes at prices ranging from about $90,000 to over $350,000 each. Total sales of over 925 units through March, 1968, indicate an average per unit price of about $180,000. Plaintiff did not sell its automatic tool changer except as a part of the Milwaukee-Matic machine, and prior to 1969 was unwilling to discuss a separate license for the tool changer.

"Plaintiff's customers include practically all types of manufacturers in the metal cutting industry, including the United States and foreign governments. The precision multiple operating capabilities of plaintiff's machines have contributed to the design and production of new products, especially in the aerospace industry.

June 29, 1965 M. MORGAN Re. 25,312

AUTOMATIC MACHINE TOOL

Original Filed Dec. 27, 1957 17 Sheets-Sheet 1

FIG. 1.

INVENTOR
MARK MORGAN

BY

*James K. Morgan*

AGENT

"Plaintiff's principal competitor in the numerically controlled automatic tool changing field is one of its licensees; at least two competitors are engaged in patent litigation with plaintiff; the total number of manufacturers is apparently about half a dozen. In 1967 plaintiff's sales represented over one-third of the total market."

*Plaintiff's Machines—MORGAN* (see sketch on page 1048).

Later in this opinion (p. 1080) we hold claim 10 [7] of the Morgan patent invalid and the rest of the Morgan claims in suit not infringed. The Morgan machine was developed at IBM as a result of interest in applying the concept of numerical control to an automatic tool changer. More about that later.

The Morgan machine employed a vertical spindle which could be moved down to grasp a tool positioned beneath it. Tools were stored in a vertical position in notches around the edge of a disc-shaped magazine which had two paths of movement. It rotated until the position in which the desired tool was located was next to the spindle. The entire magazine then moved laterally to place that tool beneath the spindle on the machine, where it was grasped by a wrenching mechanism which held it until the spindle descended and secured the tool. Thereupon the magazine withdrew by again moving laterally and after the operation was completed the magazine moved in to retrieve that tool, withdrew, rotated to a new position, moved back in to deliver the second tool to the wrenching mechanism, and then withdrew again to await completion of the second operation.

As noted by Judge Stevens, 452 F.2d 583, the Morgan tool change sequence is more time-consuming than the Milwaukee-Matic's. Nevertheless, the Morgan claims are much broader than the machine described in its specifications and read to cover the Milwaukee-Matic as well as the defendant's machines, and claim 10 might, as pointed out by Judge Stevens, encompass any numerically controlled multi-purpose machine tool with an automatic tool changer.

As noted by Judge Stevens, 452 F.2d at 583, Morgan was the principal obstacle to the allowance of plaintiff's Brainard patent. Plaintiff never accepted a license under the Morgan patent, but seriously considered not only a possible license but also a challenge to the validity of the Morgan patent before ultimately acquiring it. Morgan was the first to use a selected tool entirely removed from the magazine but did not provide the means for bodily removing the selected tool from the magazine and transporting it to the spindle. Instead the magazine was indexed to select a tool and then the selected tool still in the magazine was moved by the magazine itself to place the tool between the jaws of the vice which gripped the tool. The magazine then retracted, leaving the tool in the grip of the jaws when the spindle was lowered and rotated to engage its threads with the threads on the tool. Plaintiff says a vice is in no sense a transfer member. We agree.

The Morgan patent 2,901,927 matured from an application filed just prior to the patent application for the Brainard machine and was pending at the same time as the Brainard patent. We pass to a description of the Brainard machine.

*Plaintiff's Milwaukee-Matic Tool Changer*

This machine has a horizontal spindle and a storage drum for *tools* (not tool holders). It employs a two-handed arm. One hand withdraws the tool which has just completed an operation while the other grasps the next tool to be used

---

7. "10. A data programmed machine tool comprising a data storage medium containing data respecting the operation of said machine; data reading means for said medium; and a tool storage matrix operable in response to

said reading means for interchanging selected tools with said machine." U. S. Patent Re. 25,812, M. Morgan, "Automatic Machine Tool" issued June 29, 1965 (Original filed Dec. 27, 1957), Claim 10, p. 24, (dx. 244).

from the storage magazine, which has been rotated into the desired position while the *tool ahead of it was being* used. The arm then rotates 180°, simultaneously delivering the new tool to the spindle and returning the old tool to storage. As the arm returns to a "park" position, the storage magazine rotates to place a third tool in position for selection after the second has done its job. The selection is controlled by coding the *tools themselves,* and this tool coding (as contrasted with "position coding") makes it possible to place an old tool in the storage position from which the new tool has just been withdrawn without impairing the machine's ability to find that tool (or any other) when it is next needed. Although this description may be oversimplified (see fn. 6 at 452 F.2d 582), it:

" . . . serves to identify two concepts which are of principal importance in this litigation: (1) the use of tool coding to identify the tool to be selected from the storage magazine; and (2) the use of a two-handed arm to effect a simultaneous interchange between the magazine and the operating station." 452 F.2d at 582.

March 2, 1965 W. E. BRAINARD ETAL Re.-Re. 25,737

MACHINE TOOL WITH MECHANICAL CUTTING TOOL CHANGER

Original Filed June 27, 1958 13 Sheets-Sheet 2

*Fig. 1*

INVENTORS
Wallace E. Brainard, John A. Hansen,
Robert K. Seeborg, Charles B. Sipek
BY Hans J. Bacchie
Attorney

Neither of these concepts was expressly identified in the three Brainard claims in suit in *Giddings & Lewis*. Neither are they expressly identified in the four claims in suit before this Court (claims 19, 20, 24, and 33).[8] Plaintiff relied on the concept of tool coding to distinguish the prior art—principally the Morgan patent—during the Patent Office prosecution. The two concepts do clearly differentiate plaintiff's Milwaukee-Matic II from the Morgan machine, as pointed out by Judge Stevens. 452 F.2d 582.

Though it has already been noted, we repeat here that the application for the original Brainard patent was filed in the Patent Office June 27, 1958. Of course it was assigned to Division 13 for which T. Emmert Beall was Primary Examiner and R. H. Eanes was Assistant Examiner. I see no reason to go into an account of its prosecution as Judge Stevens did (452 F.2d 585), because all that is important and relevant is that the original Brainard claims sprang from a background free of fraud. It is important, however, to a consideration of the conflict of interest question to recognize the genius and superiority (and commercial success) of the Milwaukee-Matic II, something that cannot be gained from a reading of the foregoing description. Thus, as Judge Pell noted in his dissent in *Giddings & Lewis*, 452 F.2d at 601–602:

> "We have here in the original patent claims of an invention filling a much needed want, one entering into immediate use and one meeting with substantial commercial success. *See England v. Deere & Co.*, 284 F.2d 460, 463 (7th Cir. 1960), cert. denied, 365 U.S. 870, 81 S.Ct. 904, 5 L.Ed.2d 860."

The need was long standing and arose in large part from a growing scarcity of skilled labor. Nevertheless, we accept the plaintiff's statement (plaintiff's main brief, p. 50) that the art of providing machine tools with tool changers was in its infancy. As will become abundantly clear in the discussion of plaintiff's claim that the Brainard invention was derived from Hughes Aircraft Company, the level of ordinary skill in the art was extremely high. Also a lot of people possessing such skills were engaged in extensive projects, and the Brainard patent was an outgrowth of such projects.

What we are trying to say is that, remarkable as it was, the Milwaukee-Matic II did not emerge out of thin air, but was the outgrowth of or was preceded by a vast and extensive project at Hughes Aircraft applying numerical control to machine tools.

It helps to gain an understanding of plaintiff's accomplishments in developing the Milwaukee-Matic II, and at the same time get the facts in perspective, to realize that after learning about the Milwaukee-Matic machine, it took Cincinnati, the largest manufacturer of machine tools in the United States, if not the world, over two-and-a-half years to come up with anything comparable. This was true even though for the entire two-and-one-half year period Cincinnati was under what its personnel call "extreme pressure" to come up with something.[9] Part of this pressure arose from the occurrence of Cincinnati's 75th anniversary in 1959. It finally made one machine for the Chicago Machine Tool Show, which was later, but never sold any. It also helps to recognize the truth of what one Kearney & Trecker customer said about the Milwaukee-Matic II, namely, that it opened up "a whole new world." Small wonder then that even after obtaining the Brainard patent Kearney & Trecker continued study thereof under the heading of protecting

---

8. The effect of this will be treated later herein in the discussion of infringement. The fact that neither concept is expressly in the claims in suit is also pertinent to this discussion of fraud on the Patent Office.

9. See pp. 1082–1084 for a description of defendant's accused machines.

its substantial investment, and therein lies the tale of this lawsuit, for, in so doing, they ran aground on the shoals of conflict of interest. For, after his retirement, soon after the issuance of the Brainard patent Beall came to work for Kearney & Trecker as a part-time consultant and worked on the acquisition of Morgan and the broadening reissue applications of Brainard and Morgan.

This brings us to an account of Beall's activities and the curative measures taken by plaintiff after it recognized its mistake in letting Beall work on applications to reissue the Brainard, et al., toolchanger patent and to work on other pending applications for which he had been responsible when employed by the Patent Office.

*Beall's Activities Before and After Retirement and Curative Measures* [10]

Beall was employed by the United States Patent Office as the Primary Examiner in Division 13 (milling machines) from approximately 1946 until June 22, 1962 (r. 10210). As Primary Examiner he was charged with overall responsibility for all matters in that Division, including the pending applications of the plaintiff. In addition, he was directly involved in the prosecution of the original applications which ultimately led to the Brainard patent in suit (and the disclaimed shuttle patent (dx. 10, 11, 1096, 1097). Mr. Richard H. Eanes, Jr., was the Assistant Examiner handling these applications under Mr. Beall's direct supervision (r. 11084) and succeeded him as Primary Examiner when Beall retired.

In December, 1959, during pendency of the original Brainard tool changer application and the Brainard shuttle patent application, Beall and Eanes visited the plaintiff's plant to familiarize themselves with plaintiff's machines which were disclosed in these two applications. Such trips to industrial plants are not uncommon. In fact they are encouraged

by the Patent Office (px. 1049) to keep examiners informed. As Examiner Eanes testified (vol. 63, p. 11111):

"A. I was invited—ordered out and invited—well, let's clarify that. Ordered by the Patent Office and invited by Trecker to see the machine."

As to Mr. Beall's involvement on behalf of the Patent Office with respect to the original Brainard tool changer application, he also approved and signed Patent Office Actions (dx. 1096, tabs 22, 38, 49). During the pendency of the application he conferred with Assistant Examiner Eanes and with plaintiff's attorneys with regard to consideration of interference questions and allowability of claims (dx. 678). Plaintiff's representatives knew of Mr. Beall's personal involvement and his responsibility for making important decisions concerning the application (dx. 1032; 1096, tabs 31, 32; 687). The notice of allowance of the application for the original Brainard tool changer patent was issued June 4, 1962, and showed Mr. Beall as the responsible examiner (dx. 1096, tab 50).

Mr. Beall also had responsibility in connection with the Brainard shuttle pallet application, being involved in interviews relating to the application and the consideration and drafting of the claims of the application, and plaintiff's representatives recognized this involvement or knew of it. (See, for example, dx. 1098, tab 19, p. 8; and dx. 1097; 1098, tab 21).

On June 22, 1962, Beall voluntarily resigned from the Patent Office several years prior to reaching the mandatory age of retirement (r. 10210), having service in the Patent Office for forty years. Plaintiff's house counsel, Mr. Wutschel, along with many others who had dealt with Beall over the years, attended a retirement party for him, and, on the following day, June 25, 1962, met with Beall for lunch and explored the possibility of retaining him to work on

---

10. For Judge Steven's account of Beall's postretirement service see *Giddings & Lewis, supra,* at 586, *et seq.*

patent matters for plaintiff (r. 10210, 10250–51). At the retirement party Mr. Wutschel had overheard somebody mention retaining Mr. Beall as a consultant (vol. 54, p. 9886). He made the same inquiry of Mr. Beall the following day but was advised that Beall had several hobbies to pursue and was looking forward to that (vol. 54, p. 9886).

On his return to Milwaukee, Mr. Wutschel told Mr. Trecker what had happened, and Trecker, on one of his many trips to Washington, followed up the initial inquiry by contacting Mr. Beall by telephone (r. 10186–88, 10190). This call was followed by a visit to Beall's home, and Beall finally agreed to serve plaintiff on a part-time basis which left him free to come and go as he pleased, but which was an exclusive employment arrangement (r. 10213; dx. 879; 1096, tab 55). After a proposed letter agreement was submitted to Mr. Beall by Mr. Trecker on June 24, 1962, a final agreement was concluded August 1, 1962 (dx. 1002; 1096, tab 57).

The agreement provided for a retainer to Mr. Beall in the amount of $10,000 per year and was to run for five years. It called for Mr. Beall to perform exclusive advisory services for the plaintiff:

> " . . . with respect to all matters relating to or affecting our patent applications and patents, including prior art and engineering matters relating thereto."

There was nothing secretive about the employment, e. g., Mr. Eanes knew of Beall's employment immediately after his retirement (r. 11150). In that connection, as will appear herein, at no time did Mr. Beall attempt to, nor indeed could he, improperly influence Mr. Eanes or any other person in the Patent Office. As far as Mr. Eanes was concerned, the contrary seemed to be the case. That is, not only was no advantage obtained, but in a sense it was a

handicap as far as Eanes was concerned, because he was hostile to Beall.[11]

We need make no conclusion as to whether or not Beall's employment, as distinguished from his use, was improper. At the time of Beall's employment plaintiff had a lot at stake, inasmuch as the Brainard patent was " . . . probably the most important patent in the new machine development" (dx. 998). Also, Kearney & Trecker knew at the time of Beall's employment, as it did at the time of the decision to apply for reissue, that competitors were searching the Patent Office files in an effort to uncover prior art (dx. 679).

We have already noted the contract. It is in order also to note Mr. Trecker's testimony concerning the association:

> " . . . I felt that in his capacity of having nothing to do and a desire to do as he pleased and yet still have some interest, that we had a very good grounds of associating with each other" (r. 10190).

Elaborating on his concept of what Mr. Beall's duties would be, Mr. Trecker testified:

> "And I said he specifically did not have any assignment in particular; and I expected that he would sometimes devote a solid 20 days at a time; sometimes he wouldn't think about Kearney and Trecker for two months. It was that type of assignment with him, and that the men in the department would send him material for him to look over and comment upon, never for him to take any direct action on anything, as merely an advisor and sort of a fatherly eye watching what they were doing. And that was my complete assignment to him." (r. 10190).

Also, when Mr. Beall signed the contract (dx. 10002) there was a discussion

---

11. One exhibit (dx. 872) shows that it was not even Beall's idea to file new claims in a reissue application. The exhibit shows that Mr. Eanes (Beall's successor as Primary Ex- aminer of Division 13) indicated that it was preferable to file new claims in a reissue application rather than attempt to amend the existing claims.

between Beall and Mr. Wutschel concerning his duties:

"During this same discussion that I had with him, I explained to him that there were certain restrictions on activities that he could possibly do for Kearney & Trecker and that since he had been with the Patent Office for something like 40 years, and since there weren't any definite rules to pinpoint exactly what he could do, why, it was going to be left entirely to him to determine as to when he was doing such work whether he was in bounds or out of bounds, and that he was to inform me of such facts" (vol. 54, pp. 9910–11).

As pointed out in the defendant's main brief at p. 15, following the contract Mr. Beall began his work as patent consultant and continued in that capacity for five years. The agreement was then renewed for an additional two years. On that occasion Mr. Beall was complimented for the work he had performed (dx. 1045). During his employment, of course, Mr. Beall gave advice to Kearney & Trecker on the two reissues of the Brainard tool changer patent and assisted in the prosecution of the Brainard shuttle patent, and gave advice in connection with the acquisition of Morgan and its reissue.

Because of the importance and difficulty of the issue presented by their respective contentions of the parties on conflict of interest, it is in order to describe in detail Mr. Beall's activities in regard to the reissues of Brainard and Morgan. In September, 1962, Mr. Hajewski (Kearney & Trecker's second-in-command in the patent department) asked Mr. Beall ". . . to evaluate its [the original Brainard patent's] strength," and to ". . . determine whether the patent was vulnerable to an attack in any respect and what the prospects were for invalidation of any of the claims" (dx. 1096, tab 60).

In response to this request Mr. Beall prepared a written report dated October 17, 1962, in which he set forth his recommedations (dx. 994; 1096, tab 62). Beall summarized the Brainard toolchanger invention (pp. 2 and 3) and concluded broader claims were justified based on the prior art (p. 4) and analyzed the claims of the patent, pointing out language which unnecessarily limited them or made them vulnerable in view of the prior art.

A conference followed July 31, 1963 (dx. 909 in which Beall, Hajewski, Wutschel, Trecker, Randall and Hutchens discussed the pros and cons of refiling, and the decision was made to do so. As plaintiff points out, this decision was important, because, as noted earlier, Mr. Beall thought this was probably the most important patent in the new machine development (dx. 998). We agree with the plaintiff (plaintiff's reply brief, p. 56) that it was therefore natural that a person skilled in the machine tool arts such as Mr. Beall should be asked to evaluate the limits of the Brainard invention before it was subjected to reexamination.

When Mr. Eanes was interviewed by Hajewski on Beall's advice, regarding the possibility of reissuing the patent, Eanes opposed any such effort (dx. 679; 1096, tab 67). That same day Hajewski met with Beall to discuss his report on the original patent and the possibility of reissuing the patent (dx. 1015; 1096, tab 68; 872; 1096, tab 69).

At that time Beall assisted in the drafting of claims for the reissue application and later reviewed and commented upon the claims that were actually submitted, and he also suggested additional claims (dx. 998; 1097, tab 73). It was subsequent to that that the meeting described earlier occurred (July 31, 1963), and at the same meeting there was also discussion regarding the first reissue of the Morgan patent (dx. 909; 1097, tab 75).

The reissue patent application was subsequently filed and assigned to Examiner Eanes. The first Office Action of November 4, 1963, was unfavorable (dx. 1097, tab 87). On November 26,

1963, Mr. Wutschel wrote a letter to Beall requesting that Beall prepare an amendment and check the reissue application claims (dx. 1050; 1097, tab 88). Beall proposed an amendment by letter of December 14, 1963, and this was used in the subsequent prosecution (dx. 1016; 1097, tabs 89, 90). In such letter (dx. 1016) Mr. Beall requested (page 5);

> "Incidentally it would be helpful to me if my reports were temporarily removed from the file if and when the file is used at the Patent Office. Our friend [Examiner Eanes] might note the reports with great glee and attempt to inform a possible evasion of the two year rule. . . . Further, I do not see that any real evasion has been done and do not contemplate filing for register as a patent attorney anyway."

The "two year rule" refers to Patent Office Rule 341(g).

There is no contention that in any of this activity Beall used inside information or that he had any influence over Eanes. As already noted, the testimony showed some hostility between Beall and Eanes. Nevertheless, Beall called Eanes on March 25, 1964, and during this interview Eanes informed him that the reissue application would be allowed (dx. 1037; 1097, tab 97). A Notice of Allowance was issued on April 13, 1964, and the Brainard tool changer patent matured as Reissue Patent No. 25,583 on May 26, 1964 (dx. 765, 769). It became apparent immediately that the 47 claims did not adequately cover the machine in that they failed to include claims reciting the prehensile grip mounted on the tool transfer member and failed to recite a park or inoperative position for the tool transfer mechanism. These deficiencies came to light because of several interferences declared in other Kearney & Trecker applications (dx. 1097, tab 121). Also Mr. Hajewski discovered additional prior art (Bench and Myers) which he concluded were pertinent to the claims added in the reissue.

Hajewski therefore asked Beall to make "an independent study of these claims [reissue claims 36–47] with respect to the . . . references [Bench and Myers] to determine how our reissue application and reissue patent are affected . . . [so that] we can compare notes to determine whether we are in agreement" (dx. 1097, tab 104). Beall rendered such an opinion June 3, 1964, and subsequently met with Hajewski and Wutschel in Washington, D. C., to consider reissuing the reissue (dx. 1097, tab 106, 111).

The Brainard re-reissue application was prepared by Kearney & Trecker and was ready for filing August 26, 1964. The two-year limitation on the reissue application (35 U.S.C. § 251) was due to expire September 4, 1964. Beall was asked to hand-carry the reissue application to the Patent Office to insure that it was filed on time (dx. 1054). The second reissue application was filed August 28, 1964, and again assigned for examination by Examiner Eanes.

Beall aided and assisted in the prosecution of the re-reissue application. Hajewski interviewed Eanes after the filing (dx. 1097, tab 128) requesting citation of Bench and Myers and an amendment of claims 39 to 46. Eanes did not consider these references pertinent (dx. 1097, tab 128) and issued a notice of allowance of the Brainard re-reissue application without entry of the amendment.

At this point Hajewski asked Beall's advice on the matter of obtaining entry of the amendment and particularly his "opinion as to the best course to follow in this reissue application in view of Eanes' attitude" (dx. 1097, tab 129). As Beall noted in his reply (dx. 1097, tab 120, pp. 1 and 4):

> "One result of the proposed amendment is to make certain of the claims more specific than was previously desired and thus restrict the scope of protection . . ." [to distinguish the allowed re-reissue application from Bench].

* * * * * *

"Since the proposed amendment will not remove any limitations from the claims but, in fact, render them more specific the applicants should have the amendment entered as a matter of right. Higher authority than Eanes would unquestionably support this right even if Eanes did not."

Beall offered to deliver the amendment to the Patent Office before the December 8, 1964, deadline, Mr. Hajewski being sick at the time and unable to do so himself (dx. 1051; dx. 1097, tab 131). The filing was more than two years after Beall had left the Patent Office. However, he had not yet registered as a Patent Attorney and Eanes was aware of this when Beall appeared to deliver the amendment (r. 11092). Beall had offered by letter to "take the amendment to him [Eanes] to find his reactions and pursue the matter to higher levels if adverse" (dx. 1097 tab 130, p. 4).

Beall delivered that amendment and found Eanes hostile. Eanes refused entry of the amendment (dx. 1097, tab 134; dx. 1018). Beall's instructions were not to surrender the reissue patent unless Mr. Eanes agreed to enter the amendment (dx. 1051; 1097, tab 131). On December 4, 7 and 9, 1964, Beall interviewed Eanes with regard to the proposed amendment, including conferences at the Patent Office, luncheons and telephone conversations from their respective homes (dx. 1018, 1097, tab 134).

Eanes concluded it was a proper amendment, so it was absolutely necessary that he do something.

"So I looked it over and then I called Kearney and Trecker, and I recall time was running out, or something was imperative on it. I called Kearney and Trecker and advised them that I would enter the amendment, that it did restrict a claim . . ." (r. 11093).

The patent was issued March 2, 1965, as Brainard Tool Changer Patent Re.-Re. 25,737 (dx. 10).

So much for Mr. Beall's activities in connection with that patent.

As to Beall's activities in the acquisition and reissue of Morgan and Morgan Re. 25,812, we adopt what Judge Stevens said on that subject (452 F.2d at 588–589):

"2. *The Morgan Reissue.*

"The original application for the Morgan patent was filed on December 27, 1957, and the patent issued on September 1, 1959. A few months later, plaintiff's patent counsel made a preliminary inquiry of I.B.M. about the possibility of taking a license under Morgan.[23] Although the question

"23. Defendant was granted a license under Morgan in May, 1960.

whether the Milwaukee-Matic machine infringed the Morgan patent was the subject of study by both I.B.M. and plaintiff, no concrete action had been taken by either party before the original Brainard patent issued in September of 1962. They had a negotiating session in April of that year, however, in which the possibility of a license was discussed. In that meeting, plaintiff's patent counsel took the position that only claim 10 of the Morgan patent was arguably infringed by the Milwaukee-Matic machine, and that the broad construction required to support a charge of infringement would render the claim invalid. I.B. M.'s position was that claim 10 was valid and infringed.

"In an interview with plaintiff's patent counsel during the prosecution of the Brainard application, Beall had commented on a possible conflict with claim 10 of Morgan. Shortly after Brainard issued and Beall had agreed to serve as a consultant, plaintiff requested him to make a thorough analysis of the possible infringement of Morgan by the Milwaukee-Matic machine. His conclusions confirmed the opinion already formed by plaintiff's patent counsel that only claim 10 was infringed and that claim 10 was

invalid.[24] Promptly thereafter plain-

[24]. In the conclusion of his 23-page opinion on September 29, 1962 (DTX 83), Beall stated:

"'Claim 10—infringed but invalid.' Commenting on Beall's conclusion, plaintiff's counsel stated:

"'We were particularly pleased to find that you confirmed our thinking that all of the claims except one are not infringed by the K&T structure and that the remaining claim is invalid in view of the prior art.' (DTX 84)" . . ..

* * * * * * *

tiff reopened negotiations with I.B.M.

"In March of 1963, plaintiff consulted Beall about the advantages of purchasing the Morgan patent from I.B.M. Among the advantages which they considered was the fact that Morgan taught 'the broad concept of tape control of a tool change mechanism wherein a tool is bodily transferred from a storage member to a rotary spindle.' [Footnote omitted.] Beall recognized that the concept had been disclosed but not claimed in Morgan and immediately suggested the possibility of obtaining a reissue of Morgan after its acquisition.

"Plaintiff also recognized that the acquisition 'of Morgan would put K & T in a dominating position relative to the tool change art.' To this comment Beall responded: 'Especially true [if] Morgan was reissued.' They expressly noted that in a reissue; 'Morgan claim 10 could be altered to make it valid.'

"In an agreement effective as of April 1, 1963, plaintiff purchased the Morgan patent for $350,000, plus a share of future royalties. Before recording the assignment, plaintiff requested Beall to draft a set of reissue claims for Morgan, to prepare an opinion on the justification for reissue, and to outline the proper approach to be followed in filing the reissue application and processing it in the Patent Office.

"With Beall's guidance and assistance, the application was filed on January 17, 1964, and the patent was

ressued on June 29, 1965.[26] In the

[26]. Re. 25,812.

Morgan reissue, claim 7 was narrowed by adding qualifying language and eleven new claims were added. Except for insignificant changes in punctuation, no amendment to claim 10 was made.

"Before the Patent Office, unlike the position taken in its own appraisal during the negotiations with I.B.M., plaintiff contended that claim 10 was valid.[27] It hedged the possibility of a

[27]. In his oath supporting the reissue application, plaintiff's vice president stated unequivocally '. . . that claim 10 in original form is considered patentable . . that in order to bring out the further structure involved, claims of the character of claim 10 have been added; . . .' (DTK 7 pp. 86–87)

finding of invalidity, however, by the addition of six new claims, each of which incorporated the language of claim 10, plus additional qualifying language. The reissue was allowed on the theory that it narrowed the claims of the original patent to avoid prior art which had been overlooked inadvertently by I.B.M. The inadvertence was reasonable since I.B.M., the original owner of the patent was a company that 'manufactures electrical controls with very little, if any, experience in the machine tool field,'[28] "

[28]. Moreover, counsel for I.B.M. were, for that reason, not familiar with the machine tool industry.

Beall did assist or suggest courses of action as to the preparation and prosecution of other applications involved in Division 13 (r. 10069). Some of these applications were filed after Beall left the Patent Office (r. 10070). Defendants point out that Beall was involved in the prosecution of the disclaimed Brainard shuttle patent (dx. 11), pointing to documents in the annotated file history of such patent (defendant's main brief, pp. 119, 120).

Defendants point out that Beall was also actively involved in at least three

other applications of plaintiff in Division 13 which had been pending under his direct supervision prior to the time he retired (defendant's main brief, p. 120). These activities were stipulated by plaintiff's counsel (r. 9324–9326; 9961–9965; 10068–10071; dx. 871, 1014).

That pretty well covers the facts on conflict of interest and fraudulent procurement except a few miscellaneous ones which, according to defendant, tend to show concealment and thus guilty knowledge on the issue of intent. Under this heading is a letter from Mr. Wutschel to Mr. Beall dated May 4, 1965 (dx 913) telling Beall to make his own plane and hotel reservations in Chicago for the Machine Tool Show.

> "We naturally will want to know what hotel you are staying at so that we can communicate with you concerning patent matters. In registering at the show we would suggest that you register as a 'visitor' and not indicate your affiliations with K & T. Naturally, K & T will pick up the check for all expenses which you incur in connection with this assignment."

Along this line defendants also point to a letter from Wutschel to Beall dated September 2, 1965 (dx 915) in which Mr. Wutschel made the following observation:

> "Cy [Hajewski] is going to be in Washington next week. The Rt. Hon. Richard P. Eanes is going to hear Motions in three of the Interference Cases on Tuesday, the seventh. Cy is hoping that everything goes well and that all of the holdings prove favorable to K&T. If it were not for the fact that the attorneys representing our competitors will also be present at the hearing, I would ask you to attend too. However, I don't think this is feasible under the circumstances."

The defendants also point out in this connection what Mr. Wutschel testified to at the trial (which, of course, was long after his discharge) on direct examination. He said that when Beall signed his contract August 1, 1962, he, Wutschel, "specifically advised him of the prohibitions that are there reflected, for example, in Title 18 U.S.C. §§ 207(a) and 207(b)" (r. 9913). Wutschel was chief patent counsel at Kearney & Trecker at the time. Within a year from that Wutschel sent Beall numerous applications to work on for consulting purposes, matters that had been pending in Division 13 prior to the time Beall left the Patent Office (r. 9914).

Defendants also point to the fact that eventually, to avoid any question, Mr. Beall applied for registration as a patent attorney, and in his application stated under oath:

> "I have not prosecuted or assisted in the prosecution, and I hereby further agree not to prosecute or aid in any manner in the prosecution of any application pending in any examining division or group, during my period of service in such division or group" (dx 1058).

While Examiner Eanes knew that Beall was working with Kearney & Trecker, he testified (r. 11247–11248):

> "Q. I understand from your testimony that you were not aware of that situation, at least until Mr. Beall showed up with that proposed Amendment some two and a half years after he retired?
>
> "A. Well, at that time two and a half years, he was open anyhow.
>
> "Q. Fine.
>
> "A. I was still not aware anything had gone on between.
>
> "Q. Had you had knowledge that Mr. Beall was aiding in the prosecution of the First Brainard Re-Issue, what action would you have taken?
>
> "A. No, I can't answer such a question. That would be many years ago to begin with, and, second, I don't know what I would do.
>
> "Q. Would you have continued prosecution to go forward knowing Mr. Beall was involved?

"A. No, I think I would have gone to the patent office. For me to take direct action against any attorney, I don't do that."

Defendants say there can be no doubt that the Patent Office not only would have terminated prosecution of the Brainard reissue applications, but certainly would have initiated disciplinary investigation of the attorneys involved, even before its present investigation (dx 691; defendant's main brief, p. 129). There is no contention, however, that the Government would have invalidated the original claims.

A number of companies took licenses under the Brainard tool changer patent. The defendant, however, did not. As a matter of fact it commenced its alleged infringement prior to Beall's employment. As pointed out earlier in this opinion, litigation arose in this District and in the Northern District of Illinois, Eastern Division, as a result of said alleged infringement. Litigation also arose in the Eastern District of Wisconsin involving the Brainard patent. Kearney & Trecker employed outside counsel to represent it in such litigation, and when the foregoing facts came to light in the course of discovery apparently Kearney & Trecker realized for the first time that instead of bolstering its position by employing Mr. Beall, it had jeopardized it. Beall was terminated August 19, 1968 (r. 10229, 10230; dx. 1007). Mr. Wutschel was discharged in July, 1969 (r. 9879–9882) and Kearney & Trecker disclaimed the Brainard shuttle patent (dx 775; 1098, tab 53). Kearney & Trecker also gave up any right to enforce any of the reissue claims. Plaintiff limited the allegations of infringement in the *Giddings & Lewis* case to claims 15, 19 and 20,[12] and in the instant case limited allegations of infringement of the Brainard patent to claims 19, 20, 24 and 33. It limited allegations of infringement of the Morgan

patent to claims 10, 26, 27, 28, 29, 30, 31.

Licensees were notified of the relinquishment of Kearney & Trecker to all claims obtained through the reissue and re-reissue of the Brainard patent (notwithstanding opinions of counsel that no advantage was obtained through the use of Beall's services relating thereto). By letters plaintiff invited its existing licensees to discuss a separate license of a tool changer if they so desired. A revised form of Brainard license agreement was adopted and the plaintiff's patent department was reorganized and thereafter reported to a newly employed attorney at law of substantial experience.

But the curative action—attempts at purgation—was of no avail in *Giddings & Lewis* because on appeal the Seventh Circuit, in a landmark decision, held the reissue claims invalid and the original claims unenforceable. *Kearney & Trecker v. Giddings & Lewis, supra.*

We turn to a consideration of this and other applicable law.

## III.

## FRAUD ON THE PATENT OFFICE

### (CONFLICT OF INTEREST AND FRAUDULENT PROCUREMENT) —CONCLUSIONS OF LAW

*Giddings & Lewis—Majority Opinion*

■ The decision of the majority in *Giddings & Lewis, supra,* is pointed to as exceptional in that while fraudulent procurement has met with remarkable success as a defense, efforts to assert it as a sword as well as a shield have been less successful. Frank B. Pugsley, "Fraudulent Procurement Today," 1972 Patent Law Annual (Matthew Bender, 1972), p. 30.

But what is of far-reaching effect on patent owners is the holding, on facts the same as those before this Court, that

12. Judge Stevens noted this was a dramatic change in Kearney & Trecker's position that

29 of 60 claims in the reissue patent were infringed. 452 F.2d 580–581.

the Brainard applications for reissue should be regarded as something that had been pending before Beall retired and that any reissue relates back to the original applications for its justification.

The Court held that Kearney & Trecker was responsible for Beall's conduct. Such conduct was called "indefensible" and comparable to that condemned by the Supreme Court in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).[13] The Court found Beall's conduct "predatory" because of its wrongful character and its potential for harm to the public. Since the reissue applications were held to be a continuation of the same matter pending before Beall retired, this meant that Beall was guilty of conduct subsequently condemned by the new conflict

of interest statute, even though it was highly doubtful that Beall could actually be prosecuted under that statute since it was enacted after his conduct. The Court considered the nature of the patent grant and the reissue privilege, its potential for abuse, and interpreted 35 U.S.C. § 288 (set out in full at p. 1063 *infra*) to prohibit maintenance of an action for infringement of the original Brainard claims carried into the reissue application. The Court reasoned that the statutory language "without deceptive intention" falls in the category of actual fraud and other inequitable conduct and not technical fraud. The Court concluded that § 288 prohibits the maintenance of any action on a patent which includes claims which are invalid by reason of deceptive intention, and, since the *new* claims on which Beall helped were in that category, even action on the

13. We should note that since *Kearney & Trecker Corp v. Giddings & Lewis, Inc.*, *supra*, another Court has reached a conclusion opposite to the one reached by the Seventh Circuit on the propriety of Beall's conduct. In that case Beall sued K&T for damages for premature termination of his contract as a consultant. Beall prevailed because the Court found the evidence offered by K&T legally insufficient to establish Beall had "personally and substantially" participated in the evaluation of the Brainard patent while at the Patent Office. *Beall v. Kearney & Trecker Corp.*, 350 F.Supp. 978, 983 (D. Md., 1972). Thus, the Court was unable to conclude that K&T had shown that Beall violated the conflict of interest provisions contained in 18 U.S.C. § 207. The Court recognized that its conclusion ran counter to the holding of the Seventh Circuit on the same issue but said:

> A comparison of the evidence available to each court, however, will illustrate the reasons for this difference. As was discussed more fully above, the only substantial evidence before this court relevant to the question of whether Beall had "personally and substantially" participated in the evaluation of Kearney & Trecker's patent was that two out of four pieces of Patent Office correspondence bore his signature. The Seventh Circuit, on the other hand, had before it evidence that in December of 1959, Beall had personally visited the Kearney & Trecker plant in Milwaukee to observe a demonstration of the machine for which the patent application had been

made. 452 F.2d at 585. Furthermore, in the Seventh Circuit case, there was evidence that Beall had had several discussions with the defendant's patent counsel in relation to the then pending application, and that changes in the application were made by Kearney & Trecker at Beall's suggestion. 452 F.2d at 585–586. It was from this evidence, which was not presented in the instant case, that the Seventh Circuit was able to find that "Beall participated personally and directly in the deliberations within the Patent Office which preceded the issuance of the original Brainard patent" and that "[Beall's] signature on the Notice of Allowance was not a mere ministerial act." 452 F.2d at 590.

Thus, Beall prevailed in his action for damages for premature termination of his contract as a consultant. This puts K&T in the same position as the man who was sued for divorce by his wife on the grounds of impotency and at the same time by another woman in a bastardy case—and he lost both cases.

From the evidence in the case before this Court, the amount K&T paid to Mr. Beall would not be great. There is no evidence in this case as to K&T's losses resulting from the decision in the *Giddings & Lewis* case. However, in *Beall, supra*, at 980, the Court stated: "As a direct consequence of this decision [*Giddings & Lewis*], Kearney & Trecker have incurred damages in excess of four million dollars."

*original* claims with which he had nothing to do could not be maintained.

The decision as to whether or not Kearney & Trecker should be estopped by the judgment in *Giddings & Lewis* was not difficult. The decision as to whether to follow such decision is difficult. For this purpose the pertinent facts are for all practical purposes the same as they were in *Giddings & Lewis* with the exception that Cincinnati started to infringe before Beall was even employed by Kearney & Trecker.

At the outset we recognize that the holding of the Seventh Circuit as to the invalidity of the Brainard claims in suit is not controlling. Yet, it should be followed unless the decision discloses very palpable error in law or fact. *American Home Products v. Lockwood,* 483 F.2d 1120 (6 Cir., 1973); *American Air Filter Co. v. Continental Air Filters, Inc.,* 347 F.2d 931 (6 Cir.) cert. den. 383 U.S. 934, 86 S.Ct. 1063, 15 L.Ed.2d 852 (1963); *Cold Metal Process Co. v. E. W. Bliss Co.,* 285 F.2d 231, 236 (6 Cir., 1960); *Cold Metal Process Co. v. Republic Steel Corp.,* 233 F.2d 828, 837 (6 Cir., 1956); *Cincinnati Butchers' Supply Co. v. Walker Bin Co.,* 230 F. 453, 454 (6 Cir., 1916).

We have not overlooked the fact that one of the two cases consolidated for trial was transferred from the Northern District of Illinois, pursuant to 28 U.S. C. § 1404(a). We note that Professor Wright, at page 143 of Federal Courts (1963), said with regard to § 1404(a):

" . . . Once the motion has been granted and the papers lodged with the transferee court, the transferor court loses all jurisdiction over the case. [Footnote omitted.] *The case then proceeds in the transferee court as if it had been commenced, and all prior actions had, there."* [Emphasis added.] C. Wright, Law of Federal Courts, p. 143 (1963).

See also, 1 Barron & Holtzoff, Federal Practice and Procedure, § 86.1, p. 410 (1960).

We conclude from this that as far as the law as declared by the Seventh Circuit in *Giddings & Lewis, supra,* the Court's duty is the same as if both suits had been filed in this Court originally.

It may be ironic from the standpoint of the defendant that if it had not filed its declaratory judgment action in this Court and had entered its appearance in the infringement action in the Northern District of Illinois, they would be "home free" both as to the Brainard patent and the Morgan patent, because the District Court for the Northern District of Illinois would have been bound by the Seventh Circuit decision in *Giddings & Lewis* as far as the Brainard patent was concerned, and would certainly have decided that the Morgan claims in suit were unenforceable because, even though original, they were embodied in a reissue application obtained, in effect, "with deceptive intention" or the equivalent thereof in the form of fraudulent procurement.

We have also been mindful that the Brainard claims in suit in *Giddings & Lewis* were held unenforceable, as distinguished from invalid.[14] Also, that the decision of the Seventh Circuit was by a divided court, and there was a

---

14. This distinction does not mean a thing according to one text writer who says it is:

" . . . arguable that unenforceability of the patent on this basis [procurement of a patent by fraud on the Patent Office] should be pleadable as an estoppel to the same extent as invalidity, thus rendering immaterial· the imprecise characterization of unenforceability as invalidity. . . ."
Hamburg, Patent Fraud and Inequitable Conduct, Vol. 1, p. 4–12.
The author notes that the Supreme Court in *Blonder-Tongue* used the term "invalid" in characterizing its holding in *Walker Process* concerning "the consequences of procurement of a patent by fraud or *enforcement* of a patent with knowledge that it was procured by fraud" (emphasis supplied), thus apparently obliterating the distinction between invalidity and unenforceability. *Id.,* 4–11.

He concludes that "it would seem more equitable that the estoppel rule of *Blonder-Tongue* be applicable to unenforceability as well as invalidity than not be so applicable." *Id.,* p. 4–13.

strong dissent. The cases cited in *American Air Filter Co. v. Continental Air Filters, Inc., supra* (dealing with the "palpable error" test), all dealt with the technical question of validity of patents ruled on by unanimous courts in other Circuits. In case this makes the "palpable error" test inapplicable, we examined the decision of the majority in *Giddings & Lewis* in the light of cases which we view as holding that a district court, while not controlled by the decision of a Court of Appeals of another Circuit, should nevertheless follow it unless it is erroneous, *i. e.,* unconvincing. In that connection see *Berryhill v. United States,* 199 F.2d 217 (6 Cir., 1952); *Poole v. Stevens,* 190 F.Supp. 938 (E.D. Mich., 1960). Also in point are *United States v. Diamond,* 430 F.2d 688 (5 Cir., 1970) and *Bryant v. Standard Life and Accident Insurance Co.,* 348 F.2d 649 (5 Cir., 1969); *cf., Dawson v. Fernley and Eger,* 196 F.Supp. 816 (E.D.Va., 1971); *United States v. Eddy Bros., Inc.,* 291 F.2d 529 (8 Cir., 1961).

As to the effect of a divided court, see 21 C.J.S. Courts § 189 p. 308, where it is indicated that in some States where the decision of the courts of another State are merely persuasive the presence of a strong dissent weakens the case as an authority. We have not been cited to nor have we found any federal case on this point.

Regardless of which rule applies, the result is the same because I cannot conclude that the majority opinion in *Giddings & Lewis* discloses very palpable error in law or fact, nor can I conclude that such opinion is unconvincing. I therefore consider it my duty to follow it and give my reasons.

To begin with, it is crystal clear that there is no error of fact in the Court's holding. The majority found the use of retired Primary Examiner Beall on the reissue applications "indefensible," and that his participation as an attorney in the prosecution of such reissues "involved the same conflict of interest as if he had transferred his allegiance while the original application was still pending." 452 F.2d at 594.

Judge Pell, in dissent, accepted that characterization. This Court accepts it.

If it is not crystal clear that the majority opinion in *Giddings & Lewis* has no palpable error of *law* or is not convincing in that regard, it is not because of any fault of the opinion but because the question presented is novel and complex. The opinion itself is powerful. As noted by Judge Pell in his dissent, it is "closely reasoned [and] analytical." 452 F.2d at 600.

The question is about the *effect* of a conflict and not the *existence* thereof. Hence, I see no need to set out the pertinent regulation or Patent Office rule on that subject, rule 341(g), or the conflict of interest statute, 18 U.S.C. § 207, which became effective after Mr. Beall's employment by Kearney & Trecker. It is necessary, however, to set out the pertinent statutes governing reissue of patents. 35 U.S.C. §§ 251, 252, 253, and 288. They are set out below.

### § 251. Reissue of defective patents

Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

The Commissioner may issue several reissued patents for distinct and separate parts of the thing patented, upon demand of the applicant, and upon payment of the required fee for a reissue for each of such reissued patents.

The provisions of this title relating to applications for patent shall be applicable to applications for reissue of a patent, except that application for reissue may be made and sworn to by the assignee of the entire interest if the application does not seek to enlarge the scope of the claims 'of the original patent.

No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent. July 19, 1952, c. 950, § 1, 66 Stat. 808.

### § 252. Effect of reissues

The surrender of the original patent shall take effect upon the issue of the reissued patent, and every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form, but in so far as the claims of the original and reissued patents are identical, such surrender shall not affect any action then pending nor abate any cause of action then existing, and the reissued patent, to the extent that its claims are identical with the original patent, shall constitute a continuation thereof and have effect continuously from the date of the original patent.

No reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use or sale of the thing made, purchased or used as specified, or for the manufacture, use or sale of which substantial preparation was made, before the grant of the reissue, and it may also provide for the continued practice of any process patented by the reissue, practiced, or for the practice of which substantial preparation was made, prior to the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue. July 19, 1952, c. 950, § 1, 66 Stat. 808.

### § 253. Disclaimer

Whenever, without any deceptive intention, a claim of a patent is invalid the remaining claims shall not thereby be rendered invalid. A patentee, whether of the whole or any sectional interest therein, may, on payment of the fee required by law, make disclaimer of any complete claim, stating therein the extent of his interest in such patent. Such disclaimer shall be in writing, and recorded in the Patent Office; and it shall thereafter be considered as part of the original patent to the extent of the interest possessed by the disclaimant and by those claiming under him.

In like manner any patentee or applicant may disclaim or dedicate to the public the entire term, or any terminal part of the term, of the patent granted or to be granted. July 19, 1952, c. 950, § 1, 66 Stat. 809.

### § 288. Action for infringement of a patent containing an invalid claim

Whenever, without deceptive intention, a claim of a patent is invalid, an action may be maintained for the infringement of a claim of the patent which may be valid. The patentee shall recover no costs unless a disclaimer of the invalid claim has been entered at the Patent Office before the commencement of the suit. July 19, 1952, c. 950, § 1, 66 Stat. 813.

We agree with what the *Giddings & Lewis* Court said about the purpose of the patent grant and the nature of the

reissue privilege (452 F.2d at 592–94). It is noted that less than one percent of patents that are granted are subsequently reissued. Also broadening reissues contain certain risk of abuse not involved in the mere correction of an error in a specification or in a narrowing reissue. *Id.*, p. 593. It was in view of the nature of the patent grant and reissue that the Court concluded:

". . . Beall's participation as an attorney in the prosecution of the Brainard reissues involved the same conflict of interest as if he had transferred his allegiance while the original application was still pending. His conduct was indefensible." 452 F.2d at 594.

Hence, the Court concluded that claims 36–60 of the Brainard Re.-Re. 25,737 were invalid. 452 F.2d at 594. I certainly agree and, by the same reasoning, as a result of plaintiff's reissue of the Morgan patent with claim 10 which it knew to be invalid and also under the rationale of *Keystone Co. v. Excavator Co.*, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933); *Precision Co. v. Automotive Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); and *Walker, Inc. v. Food Machinery*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), conclude that claims 21–31 of Morgan, Re. 25,812 are invalid.

The Court in *Giddings & Lewis* continued:

". . . *Hazel Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, . . . [and] *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293. . . . hold . . . the facts call for nothing less than a complete denial of enforceability of any of the claims acquired by reissue." 452 F.2d at 594.

And the Court further concluded that *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247:

". . . characterized a patent procured by fraud as not merely unenforceable but invalid. . . ." 452 F.2d at 594.

As we read the opinion, the Court concludes the effect of *Walker* is to hold the original Brainard claims unenforceable *as a matter of law* and not as a result of the application of the equitable doctrine of "unclean hands." This holding removes the decision as to the enforceability of the original claims from the area of the trial court's discretion. This is indicated by the Court's conclusion that *Walker's* holding makes *irrelevant* attempts by the patent owner to purge itself of inequitable conduct.

The Court reached this conclusion by construing 35 U.S.C. § 288 as prohibiting the maintenance of any action on a patent that includes claims which are invalid by reason of deceptive intention. Thus, the original Brainard claims were, for all practical purposes, invalidated (rendered unenforceable) though the Court accepts the District Court's holding of validity and conceded that such claims were properly obtained.

*Giddings & Lewis Dissent*

This far-reaching effect on the patent owner drew the following comment in the dissent of Judge Pell:

". . . it imposes punishment for misconduct not legally related to patent claims sought to be enforced." 452 F.2d at 600.

For the purpose of his dissent, Judge Pell accepted the conclusion of the majority that Beall's conduct was indefensible, but said:

". . . my thesis is that subsequent activity should not be retroactively applied to invalidate that which was otherwise validly achieved without found irregularity." 452 F.2d at 601.

Judge Pell continued:

"The majority opinion achieves retrospective invalidation via 35 U.S.C. § 288 in the words 'without deceptive

intention' but ignores the clear mandate of 35 U.S.C. § 252 that the claims of the original patent 'have effect continuously from the date of the original patent.'

\* \* \* \* \* \*

"While the issue of deceptive intention was not before the court in *Foxboro Co. v. Taylor Instrument Companies,* 157 F.2d 226, 228 (2d Cir. 1946), cert. denied, 329 U.S. 800, 67 S.Ct. 494, 91 L.Ed. 684, the principle enunciated by Judge Learned Hand in that case would seem to me to be applicable: '\* \* \* the surrender of the original patent, resulting from the acceptance of the reissue, did not invalidate any claims which he [the original patentee] carried over into the reissue.'

"Judge Hand was of the opinion, as I am, that the matter was set at rest by the amendment of the precursor of 35 U.S.C. § 252. Section 252 was taken from Section 64 of Title 35 and it is of interest to note that the prior section refers to 'fraudulent or deceptive intention' but relates this only to error in connection with the original patent.

"We have here in the original patent, claims of an invention filling a much needed want, one entering into immediate use and one meeting with substantial commercial success. *See England v. Deere & Co.,* 284 F.2d 460, 463 (7th Cir. 1960), cert. denied, 365 U.S. 870, 81 S.Ct. 904, 5 L.Ed.2d 860." 452 F.2d 601–602.

Judge Pell was of the further opinion that the abandonment of all claims other than those based on the original patent: ". . . 35 U.S.C. § 252 is a proper basis for the bringing of the present action and makes proper the decision reached by the district court." 452 F.2d at 602.

The dissent points out that there was authority that purging steps may be effective at any stage of the proceedings. (452 F.2d 602, citing, *e. g., White Cap*

*Co. v. Owens-Illinois Glass Co.,* 203 F.2d 694, 698 (6th Cir.), cert. denied, 346 U. S. 876, 74 S.Ct. 128, 98 L.Ed. 384 (1953); *cf., Standard Oil Co. v. United States,* 283 U.S. 163, 51 S.Ct. 421, 75 L. Ed. 926 (1931).

The dissent also cites authority for the proposition that the effectiveness of purging efforts is largely within the discretion of the trial court. 452 F.2d at 602. Finally, the dissent notes that even though the majority drew no inference of admission of misconduct from the retractive steps, its opinion can only discourage others from trying to set their own houses in order since "the alternative obviously is a vigorous litigative defense." 452 F.2d at 602.

As pointed out by the plaintiff (brief of plaintiff on defendant's affirmative defense of collateral estoppel, p. 11), a neutral observer views the majority's reasoning as "complex" and commented that the majority appeared to be incensed by Beall's role in plaintiff's acquisition of the related Morgan patent and in reissuing it. F. Pugsley, Fraudulent Procurement Today, 1972 Patent Law Annual, p. 30 (Matthew Bender 1972).

In addition to the questions raised above, others arose in the course of study of the majority opinion. For one, we found it difficult to reconcile the *result* in *Giddings & Lewis* with that in certain cases involving other forms of patent misuse and purgation thereof. See, *e. g., Preformed Line Products Co. v. Fanner Mfg. Co.,* 328 F.2d 265 (6 Cir.), cert. den. 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51 (1964); *Westinghouse Electric Corp. v. Bulldog Electric Prods. Co.,* 179 F.2d 129 (4 Cir. 1950); and *White Cap Co. v. Owens-Illinois Glass Co.,* 203 F.2d 694 (6 Cir.), cert. den. 346 U.S. 876, 74 S.Ct. 128, 98 L.Ed. 384 (1953). And see, *Ansul Company v. Uniroyal, Inc.,* 306 F.Supp. 541 (S.D. N.Y., 1969), a case regarded as particularly "instructive" in an outstanding paper on "Misuse and Its Purgation" delivered at the 1973 American Bar As-

sociation Meeting in Washington, D. C., by Tom Arnold, later published in 42 Antitrust Law Journal, No. 3, p. 665. In *Uniroyal*, we find the following, at p. 560:

Since the doctrine of misuse is equitable in nature, based on the public policy against allowing one who wrongfully uses a patent to enforce it during the period of misuse, it has long been recognized that upon dissipation or purge of the effects of such misuse the patentee may thereafter enforce his lawful monopoly. *United States Gypsum Co. v. National Gypsum Co.*, 352 U.S. 457, 465, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957); *McCullough Tool Co. v. Well Surveys, Inc.*, 343 F.2d 381, 410 (10th Cir. 1965), cert. denied, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966); *Preformed Line Products Co. v. Fanner Mfg. Co.*, 328 F.2d 265, 278 (6th Cir.), cert. denied, 379 U.S. 846, 85 S. Ct. 56, 13 L.Ed.2d 51 (1964); *White Cap Co. v. Owens-Illinois Glass Co.*, 203 F.2d 694 (6th Cir. 1953); *United States v. Imperial Chemical Industries, Ltd.*, 105 F.Supp. 215, 224 (S. D.N.Y.1952). Furthermore, there is no time bar against such a purge. A patentee may revive enforceability of his patent by correcting a misuse after commencement of an action for infringement, *B. B. Chemical Co. v. Ellis*, 314 U.S. 495, 498, 62 S.Ct. 406, 86 L.Ed. 367 (1941); *Preformed Line Products Co. v. Fanner Mfg. Co., supra*, 328 F.2d p. 278; *Printing Plate Supply Co. v. Crescent Engraving Co.*, 246 F.Supp. 654, 672 (W.D.Mich. 1965), or even after judgment. *Hensley Equip. Co. v. Esco Corp., supra* [383 F.2d 252 (5 Cir.)].

In the Arnold paper, *supra*, p. 672, the statement is made:

". . . It is equally clear that at least some antitrust violations, like fraudulently procuring and enforcing a patent, are not 'misuse' that can be purged."

While our study leads to an appreciation of the majority opinion, we trust it is not inappropriate to note two other questions, *i. e.*, reservations which arose. One was in connection with the Court's statement that early patent cases likened the patent situation to a contract. 452 F.2d at 593. The Court noted that:

". . . At the time the patent issues, the inventor's disclosure to the public is complete. Having dedicated his idea to the public domain, he has no further consideration to deliver in exchange for additional monopoly protection to be obtained by a reissue of his patent." 452 F.2d at 593.

The other side of the coin is that once the consideration is given (*i. e.*, the disclosure made), it cannot as a practical matter be withdrawn, for it is beyond the power of the Government to put the inventor back into the position he was in before he made the disclosure.

Lastly, our most important reservation arises in connection with the statement at page 597:

". . . since the conduct is within the 'deceptive intention' category, the curative steps cannot overcome the statutory objection to maintenance of the action."

Just prior to this statement the Court rejected plaintiff's contention that its attempts at purgation cleansed its hands sufficiently to protect the viability of claims 15, 19 and 20. The Court said that since the plaintiff was charged with the responsibility for and knowledge of Beall's conduct, its commencement of the litigation asserting infringement of the reissue claims as well as those still in dispute was itself an abuse of the patent privilege and—

". . . [n]ot until after Beall's conduct was revealed during pretrial discovery did plaintiff renounce its efforts to exploit the broadening reissues." *Id.*

By rejecting plaintiff's contentions that it purged itself *in time*, the Court seems to recognize the "clean hands"

doctrine. But it goes on to say that curative steps *cannot* overcome the statutory objection to maintenance of the action. As indicated earlier in this opinion, we view this as holding as a matter of law that original claims are unenforceable if included in a reissue application along with new claims obtained with deceptive intention. That makes the rule rigid and not like it is in other patent misuse cases where denial of relief is based on the "clean hands" doctrine. In such cases evidence of extensive purging attempts is highly relevant.[15]

Although dealing with the subject of collateral estoppel, it seems worthwhile to repeat here the language from *Blonder-Tongue v. University Foundation*, 402 U.S. 313, 334, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (1971) (which we quoted at p. 1045, *supra*) that the "decision will necessarily rest on the trial courts' sense of justice and equity." See also, *Wahl v. Vibranetics, Inc.*, 474 F.2d 971 (6 Cir., 1973). The decision as to the effect of the fraud on the Patent Office, however, does not rest in the sense of justice and equity of the trial courts.

So much for our reservations. We here extend this portion of our opinion only to make several observations regarding the nature of fraud on the Patent Office. In our consideration of conflict of interest, we recognize at the outset that "[t]hat strict common law requirements for establishing fraud have been relaxed, and fraud now includes a much broader range of inequitable conduct." Patent Fraud and Inequitable Conduct, Preface, C. Bruce Hamburg (Clark Boardman Company, Ltd., 1973).

We recognize, too, that "[c]onduct . . . . deemed analogous to fraudulent procurement can result not only in unenforceability of the patent but in basis for an antitrust action under *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, [382 U.S. 172 [86 S.Ct. 347, 15 L.Ed.2d 247] (1965)]." *Id.*, at § 1.06[2], p. 1–49. With the above in mind, we took note of the definition of fraud in *Kolene Corp. v. Motor City Metal Treating, Inc.*, 440 F.2d 77 (6 Cir., 1971) where the Court adopted the definition of the Court of Customs and Patent Appeals in *Norton v. Curtiss*, 433 F.2d 779, 57 C.C.P.A. 1384 (1970),[16] which dealt with defense of fraud in the context of a priority determination and which "considered fraud of two types: (1) technical fraud which is actionable in itself, and (2) an unclean hands defense based on inequitable conduct." 440 F.2d at 83. In *Kolene* the definition was in the context of a patent infringement suit with a defense of fraudulent procurement, and the Court indicated that ". . . 'scienter' or fraudulent intent . . . is an integral part of the defense of fraud." *Id.*

Noting that "traditionally the concept of 'fraud' . . . refer[s] to a type of conduct so reprehensible that it could not by way of punishment for extraneous transgressions, but upon considerations that make for the advancement of right and justice. They are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Keystone Co. v. Excavator Co.*, 290 U.S. at 245, 54 S.Ct. at 147. And see *Precision Co. v. Automotive Co.*, 324 U.S. 806, 815, 65 S.Ct. 993, 89 L.Ed. 1381 (1944).

---

15. In such cases:
 " . . . [C]ourts of equity do not make the quality of suitors the test. They apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. They do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication. Story, *id.*, § 100. Pomeroy, *id.*, § 399. They apply the maxim,

16. For another definition of fraud, see also § 1.03, Patent Fraud and Inequitable Conduct, Hamburg (Clark Boardman Company, Ltd., 1973).

alone form the basis of an actionable wrong (*e.g.*, the common law action for deceit)," the *Norton* Court went on to say that " . . . the term 'fraud' is also commonly used to define that conduct which may be raised as a defense in an action at equity for enforcement of a specific obligation. . . ." 433 F.2d at 792–93. Further, the *Norton* Court declared that in these situations:

" . . . the courts appear to look at the equities of the particular case and determine whether the conduct before them—which might have been admittedly less than fraudulent in the technical sense—was still so reprehensible as to justify the court's refusing to enforce the rights of the party guilty of such conduct. It might be said that in such instances the concept of fraud becomes intermingled with the equitable doctrine of 'unclean hands'. . . ." *Id.*

According to the *Norton* court, it is clear that:

" . . . the courts have become more critical in their interpretation of the relationship existing between applicants for patent and the Patent Office and their scrutiny of the conduct of applicants in light of that relationship. Not unlike those appearing before other administrative agencies, applicants before the Patent Office are being held to a relationship of confidence and trust to that agency. The indicated expansion of the concept of 'fraud' manifests an attempt by the courts to make this relationship meaningful." *Id.*

What the Court said on the same page is also deemed noteworthy:

" . . . The ex parte prosecution and examination of a patent application must not be considered as an adversary proceeding and should not be limited to the standards required in inter partes proceedings. * * * The highest standards of honesty and candor on the part of applicants in presenting such facts to the office are thus necessary elements in a working patent system. We would go so far as to say they are essential. . . ."

In *Kolene v. Motor City Metal Treating, Inc., supra*, the Court said (at p. 84) that "[t]he patent misuse defense is bottomed on public policy considerations. The defense is not a personal one in the sense that the misuse must be directed at the infringement suit defendant. . . ." The *Kolene* Court (quoting *Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488, 494, 62 S.Ct. 402, 86 L.Ed. 363) also noted that " '[u]ndoubtedly "equity does not demand that its suitors shall have led blameless lives," *Loughran v. Loughran*, 292 U.S. 216, 229, 54 S.Ct. 684, 78 L.Ed. 1219.' " *Id.*

Finally, along this line we note our recognition of the statement in the majority opinion in *Giddings & Lewis* that a patent is not meant to be a "beachhead from which, once secured, a patentee may scout adjacent territory for possible conquest by means of acquisition and reissue." 452 F.2d at 597.

So much for the reasons why we find the majority opinion in *Giddings & Lewis, supra*, convincing, our reservations on that score and some highlights of the law of fraudulent procurement. On the authority of such principles and the *Giddings & Lewis* case, the Court concludes that on the facts as found in this case the original Brainard and Morgan claims in suit in this case are unenforceable.

### IV.

### VALIDITY—LAW

■ Ordinarily validity is inquired into fully because of its importance. *Preformed Line Products Co. v. Fanner Mfg. Co.*, 328 F.2d 265, 267 (6 Cir., 1964). In this case it seemed in order to first determine whether plaintiff was collaterally estopped to assert its claims with respect to the Brainard patent by the judgment in *Giddings & Lewis, supra*, and, if not estopped, whether this Court should follow the far-reaching decision of the Seventh Circuit in that

case. We recognize that would not have been necessary unless the Court found either the Morgan or the Brainard patent valid and infringed. We next state our conclusions of law on this aspect of the case.

A patent, of course, is presumed valid and "[t]he burden of establishing invalidity of a patent shall rest on a party asserting it." 35 U.S.C. § 282. See also, *H. K. Porter Co. v. Goodyear Tire & Rubber Co.*, 437 F.2d 244 (6 Cir., 1971); *Simplicity Mfg. Co. v. Quick Mfg., Inc.*, 355 F.2d 1012, 1014 (6 Cir., 1966). The Seventh Circuit, however, has said that "[t]he presumption of validity is largely, if not wholly, dissipated when pertinent prior art is shown not to have been considered during the processing of the patent application." *Deep Welding, Inc. v. Sciaky Bros., Inc.*, 417 F.2d 1227 (7 Cir., 1969).

Nevertheless, presumption of validity is not destroyed merely by the failure to *cite* pertinent prior art. The defendant assumes the burden of proving that the reference upon which he relies anticipates the patent in suit or demonstrates a lack of invention. *Preformed Line Products Co. v. Fanner Mfg. Co., supra,* at 271.

For tests in determining patentability we look first to the statutes. 35 U.S.C. § 101 provides in part:

"Whoever invents or discovers any new and useful . . . machine . . . or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

Thus, there must be an invention and the applicant for a patent must have invented it himself. The invention must be useful and novel and nonobvious. To demonstrate a lack of novelty defendants must show that the identical invention was found in the prior art.

The prior art is defined in 35 U.S.C. § 102, and (as stated in plaintiff's pretrial memo at pp. 22–23) includes the following:

(1) Patents or printed publications of this or a foreign country which issued or were published either before the applicant for patent made his invention or more than one year prior to the date that the applicant filed an application for his invention in the United States;

(2) Knowledge or use by others in the United States before the applicant for patent made his invention (but such knowledge or use must be public and not kept secret), *Gillman v. Stern*, 114 F.2d 28, 31 (2 Cir., 1940), cert. den., 311 U.S. 718, 61 S.Ct. 441, 85 L.Ed. 468; and must be of a completed invention, *Block v. Nathan Anklet Support Co., Inc.*, 9 F.2d 311, 313 (2 Cir., 1925); *Stearns v. Tinker & Rasor*, 220 F.2d 49, 56 (9 Cir., 1955), cert. den. 350 U.S. 830, 76 S.Ct. 62, 100 L.Ed. 741;

(3) A public use or sale in this country of the invention more than a year prior to the date of the application for patent in the United States;

(4) An invention described in a U. S. patent if the application for such patent was filed before the applicant for the patent in suit made his invention; and

(5) An invention made in this country before the applicant made his invention, by another person who did not abandon, suppress or conceal it [but this requires more than merely having an idea or concept of the invention—it requires reducing that concept to practice by embodying it into a concrete form, *Minneapolis St. P. & S.S.M. Ry. Co. v. Barnett & Record Co.*, 257 F. 302 (8th Cir., 1919)].

The nonobviousness test is embodied in 35 U.S.C. § 103 above. It makes a condition of the patent that:

" . . . [T]he differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been *obvious* at the time the invention was made to a person having ordinary skill in the art . . . ."

Its authors intended it as a test of "invention" and the Supreme Court took

this view in *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966):

> Approached in this light, the § 103 additional condition, when followed realistically, will permit a more practical test of patentability. The emphasis on nonobviousness is one of inquiry, not quality, and, as such, comports with the constitutional strictures.

While the ultimate question of patent validity is one of law, *A. & P. Tea Co. v. Supermarket Corp., supra*, [340 U.S. 147] at 155 [71 S.Ct. 127, 95 L. Ed. 162], the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. See Note, Subtests of "Nonobviousness": A Nontechnical Approach to Patent Validity, 112 U.Pa.L.Rev. 1169 (1964).

The Sixth Circuit points out that the foregoing recognizes the factual and legal composition of the question of obviousness. See, *Westwood Chemical, Inc. v. Owens-Corning Fiberglas Corp.*, 445 F.2d 911, 914 (6 Cir., 1971), where the Court said

> This Circuit has approached the question of what constitutes "obviousness" through a three-step test prescribing what portions of the question turn on factual determinations and which are purely legal. The first step is "a determination of what the prior art was; this involves factual questions. Secondly, there is a determination of what, if any, improvement the patentee has made over the prior art; this will usually turn on expert testimony and therefore is a question of fact. The final step is to determine whether the improvement would have been obvious to one skilled in the art. This requires application of a legal criteria and therefore is a question of law, fully reviewable by the appellate court." *Monroe Auto Equipment Company v. Heckethorn Manufacturing & Supply Company, supra*, 332 F. 2d 406 at 411.

See also, *Kolene Corporation v. Motor City Metal Treating, Inc.*, 440 F.2d 77, 81 (6 Cir., 1971); *Anderson's-Black Rock v. Pavement Co.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); *Parker Sweeper Company v. E. T. Rugg Company*, 474 F.2d 950 (6 Cir., 1973); and *Eisele v. St. Amour*, 423 F.2d 135 (6 Cir., 1970).

Before proceeding to a determination of the scope and content of the prior art for both Brainard and Morgan, we cross-reference the reader to the description of those machines *supra* at 1048, 1049–1050.

Next, we should say a word about the development of the Morgan machine and elaborate on what has already been said about the development of the Milwaukee-Matic II (Brainard).

We also should say we have not overlooked what the Court stated in its opinion in *Anderson's-Black Rock v. Pavement Co., supra*, 396 U.S. at p. 61, 90 S. Ct. at p. 308:

> A combination of elements may result in an effect greater than the sum of the several effects taken separately. No such synergistic result is argued here. It is however, fervently argued that the combination filled a long felt want and has enjoyed commercial success. But those matters "without invention will not make patentability."

*A. & P. Tea Co. v. Supermarket Corp.*, 340 U.S. 147, 153 [71 S.Ct. 127, 95 L. Ed. 162].

The patent standard is basically constitutional, Article I, § 8, of the Constitution authorizing Congress "[t]o promote the Progress of . . . useful Arts" by allowing inventors monopolies for limited times. We stated in *Graham v. John Deere Co.*, 383 U.S. 1, 6 [86 S.Ct. 684, 688, 15 L.Ed.2d 545], that under that power Congress may not "enlarge the patent monopoly without regard to the innovation, advancement or social benefit gained thereby. Moreover, Congress may not authorize the issuance of patents whose effects are to remove existent knowledge from the public domain, or to restrict free access to materials already available. Innovation, advancement, and things which add to the sum of useful knowledge are inherent requisites in a patent system which by constitutional command must 'promote the Progress of . . . useful Arts.' This is the *standard* expressed in the Constitution and it may not be ignored."

On this aspect of the case, see also, *Preformed Line Products Co. v. Fanner Mfg. Co.*, 328 F.2d 265, 272 (6 Cir., 1964), where the Court said:

In *Maytag Co. v. Murray Corp. of America*, 313 F.2d 79, 81, C.A. 6, this Court said: "The test of invention where old elements are used in the alleged invention is whether those elements are used in a manner different from the previously known use in such a way that the alleged invention would not have been obvious to one skilled in the art." This Court also said, in *Bede v. Baker & English, Inc.*, 274 F. 2d 833, 839, C.A. 6: "The combination of old parts or elements, in order to constitute a patentable invention, must perform or produce a new and different function or operation than that theretofore performed or produced by them; it is not sufficient that the combination be superior to

what went before in producing a more convenient and more economical mechanism." See, *Harvey v. Levine*, 322 F.2d 481, 485, C.A. 6.

See also, *Sterling Aluminum Products, Inc. v. Bohn Aluminum & Brass Corp.*, 187 F.Supp. 879 (E.D.Mich.S.D., 1960), aff'd 298 F.2d 538 (6 Cir., 1962); *Canadian Ingersoll-Rand Co. v. Peterson Products of San Mateo*, 233 F.Supp. 803 (N.D.Cal., S.D., 1963), at p. 822, citing, *Farr Co. v. American Air Filter Co.*, 318 F.2d 500 (9 Cir., 1963), and its citation of *Altoona Publix Theatres v. American Tri-Ergon Corp.*, 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005 and other cases.

At first blush this seems to unsettle what the authors of § 103 (35 U.S.C. § 103) sought to settle by substituting the nonobvious test for the test of invention. (See, "Laying the Ghost of the 'Invention' Requirement," by Giles S. Rich, Associate Judge, United States Court of Customs & Patent Appeals, September 18 and 20, 1972, paper delivered to the Patent Law Association of Los Angeles and San Francisco, page 10.)

Judge Rich concludes there can be no justification for treating an invention which is a combination of old elements differently from any other, especially as applied to mechanical patents (*id.*, p. 23). We agree with that conclusion and the further statement that if there are inconsistencies between *Black Rock* and *Graham* the Court will stick with *Graham* (*id.*, p. 24).

Finally, we state agreement with the conclusion of Judge Rich that where the invention consists of a combination of old elements in order to be patentable, there must be invention, *i.e.*, it must be nonobvious, but it is not necessary to determine there is a "synergistic effect," whatever that is.

VALIDITY—NOVELTY, PRIOR ART, NONOBVIOUSNESS — DERIVATION—FRAUD ON THE PATENT OFFICE

With the foregoing law in mind, we next look at the Morgan and Brainard

machines to see if they meet the novelty test of § 102 (35 U.S.C. § 102). Also we will examine the prior art references relied on by the defendant, and determine whether any anticipates the patents under 35 U.S.C. § 102, or negates patentability under 35 U.S.C. § 103. Finally, we will consider defendant's claim that both inventions are obvious to persons skilled in the art.[17]

The Morgan machine was the product of an extensive research program for ways to apply IBM's numerical control to the machine tool industry. The Brainard machine was the product of a research program which was the outgrowth of a joint venture between Kearney & Trecker and Hughes Aircraft Corporation, with a purpose like that of IBM so far as Hughes was concerned.

It is in order to note that a well-qualified observer, Ford's Leroy E. Ording, testified (tr. 7014):

"It has historically been a fact that the machine tool people very rarely originate—and I am not trying to offend anyone, but this has been a fact. Let's not put it that they don't originate anything. They don't give us as manufacturers anything that we don't ask for. They have never been known to be research and development oriented. . . . They will design and build for you what you want to the requirements that you want it."

We believe that at the time the joint venture between Hughes and Kearney and Trecker commenced, Kearney and Trecker was manufacturing what Hughes ordered. As time went along, the two companies began pulling in different directions, and the joint venture was terminated. Kearney and Trecker continued its own research effort, which eventually resulted in the Milwaukee-Matic Machines.

Every facet of both programs is described in the briefs (plaintiff's main brief, p. 2, *et seq.*; defendant's proposed findings of fact, pp. 18–30.) Suffice it to say here, as to Morgan, that this patent was the result of a project begun in February, 1955 by a group at IBM led by Mark Morgan. The purpose of the project was to design and produce an *automatic jig boring machine* for use in IBM component production. The automatic jig boring machine was to include the capability to select and change cutting tools automatically, without the intervention of a human operator.

As to the Brainard tool changer, as noted above, during the joint venture with Hughes,[18] Kearney and Trecker (under the direction of Wallace Brainard)[19] pursued a course of design

---

17. The defendant contends the Brainard patent is invalid in the light of the prior art, 35 U.S.C. § 103; that it lacks novelty under 35 U.S.C. § 102; and that the facts require the conclusion of law that the patent is invalid by reason of obviousness.

18. There is considerable confusion in the testimony regarding project numbers assigned to work done for Hughes at Kearney and Trecker and work which Kearney and Trecker allege was their own independent and entirely separate project. However, a number of the exhibits make clear that both project numbers ED 74 and ED 77 were used on the Hughes line of machine, one being the first of the three-machine line project, and the other being an evolution of further development which was also begun and implemented under the joint venture. As things turned out, the "second project" turned *into* the Milwaukee-Matic project as time went on and Hughes withdrew from the venture. This is clear from the testimony of John Hansen, K&T's project engineer:

"Q. I believe there were certain developments, however, that were made which were not Flexomatic I developments which I believe we have referred to as Flexomatic II developments. . . .

"A. Yes. But I cannot use the term Flexomatic II because the same designs were later used in the Milwaukee-Matic and so there's no real distinction between Flexomatic II, as you call it, and Milwaukee-Matic."

See also the testimony of Hughes' Dr. Leone, tr. 1873, *et seq.*

19. Dx 54, Wagenseil to Russell, monthly report, shows that in December, 1956 Brainard became responsible for the physical design of the next series of K&T machines, using Hughes controls, and at the same time K&T would be receiving and assembling Hughes' Model II control unit."

and development of a single-spindle tool changing machine and a multiple spindle tool changing machine until May, 1957, when it was decided to go in the direction of a single-spindle machine with tool changing.

Thereafter many ideas for different types of tool transfer mechanisms and storage mechanisms were drawn, and in the fall of 1957 the concept was put forth to make what is substantially the arrangement shown in the Brainard tool changer patent; namely, using a double-ended tool transfer arm in which the tool in the spindle and the newly selected tool are grasped simultaneously, removed simultaneously and interchanged. It was then decided that two machines in the line would be identical and have the same tool changer mechanism. Production drawings for the storage magazine and tool change arm were completed by January, 1958, and it was decided to sell the tool changer machine of the line as a separate machine.

Hughes was asked to quote on controls for this single machine but did not do so. By mid-1958 the single machine, substantially disclosed in the Brainard patent, had been assembled at plaintiff's plant with its automatic tool changer mechanism. The machine was known as the Milwaukee-Matic II machine and was shown to selected potential customers in the summer of 1958 prior to its being publicly announced in October, 1958.

Plaintiff contends (plaintiff's proposed finding 19) a major technological advance of the Brainard tool changer invention was the provision of a multifunction machine tool with a tool changer in which the next tool to be used could be preselected and placed in a position for change so that when it was time for tool change to occur, the selected tool and the previously used tool would be simultaneously removed and quickly interchanged. We agree.

The Brainard invention is highly useful. It is also novel and defendants have not shown that the identical invention was found in the prior art as defined in 35 U.S.C. § 102.

As noted by the District Court in *Giddings & Lewis,* 306 F.Supp. at 191, the principal prior art which was considered by the Patent Office before the allowance of the original Brainard patent was the Morgan patent, 2,901,927. The fact that the Brainard patent issue speaks for itself as far as the view of the Patent Office. Nevertheless, the Morgan patent was relied on, as it was in *Giddings & Lewis,* as prior art with respect to claim 21 of the Brainard tool changer patent. The Morgan patent does not show a structure in which a tool could be selected and moved into the tool-ready station while a machining operation is being performed at the operating station. The Morgan patent does not disclose a tool change arm for transporting tools from the tool-ready station for replacing a tool in the tool holding means. In the structure disclosed by Morgan a tool change is accomplished by withdrawing the spindle upwardly, grasping the tool with a wrenching mechanism, disengaging the spindle from the tool, moving the tool storage matrix in to recover the last-used tool, releasing the wrenching mechanism, rotating the matrix to bring the new tool in line with the spindle, grasping the new tool with the wrenching mechanism. In the structure shown by Brainard and claimed in claim 21, the tool is preselected and most of such steps are eliminated.

The defendant places principal reliance on the Hughes public prior art which was not before the Patent Office and not considered by the District Court in the *Giddings & Lewis* case. As I understand it, this is the center machine disclosed (but not claimed) in the Kumagai patent No. 3,245,144 (dx 7) (the Hughes systems control patent). I find the Brainard patent is an improvement on and significantly different from that machine. Suffice it to say here that the Hughes machine had a gatling-gun-type of storage drum of spindles with tools

attached and workable, but impracticable, means of exchanging such spindles. I do not think it anticipates the Brainard machine. The defendant left no stone unturned in its effort to prove not only that the Hughes public prior art anticipated Brainard but made it obvious. Defendant also contends Brainard was derived, i. e., stolen from Hughes, and in the discussion later of the evidence pertinent to these contentions, we may have more to say about the Hughes prior art, both public and nonpublic. Suffice it to say here the Court finds the Brainard patent is not anticipated by Hughes.

As defendant did in the *Giddings & Lewis* case, defendant herein asserts Brainard is anticipated by other relevant prior art not considered by the Patent Office, namely: Conradson, 2,323,-010; Hautau, 2,919,010 and the N-3 Hautau loader; and the Martinair *Machinery* article (dx. 828, tab 4). Conradson harks back to the days before automation.

As found by Judge Gordon:

"The Conradson patent discloses a lathe with a tool carrier from which an operator can visually select and manually withdraw for use and manually return various tools." 306 F. Supp. at 192.

It has no selection means as called for by the Brainard claims and differs significantly from the Brainard claims in suit.

Hautau Patent No. 2,919,010 and a Hautau N-3 loader having a similar structure are relied upon as prior art as to the Brainard tool changer patent. Hautau disclosed a work handling device which would load and unload the chuck of a lathe or grinder. Neither the patent nor the N-3 loader discloses the concept of automatic tool changing. Neither has "tool storage means," nor "tool selection means," nor a "tool ready station," nor other elements of the Brainard claims. Although the work handling arms of Hautau are similar to the tool change arm disclosed by Brainard, they

would not make obvious the Brainard concept to one of ordinary skill in the art.

As noted by the District Court in *Giddings & Lewis* in the Martinair *Machinery* article there is a disclosure of a lathe having means to alternate between two tools. One slides into working position on one side and is removed on the other side. 306 F.Supp. at 192. Clearly, as noted by the District Court, the Martinair device does not have "a control system operably connected" nor does it provide "a plurality of tools removably carried by said tool storage magazine." It did not anticipate Brainard, and the failure of the Patent Office to consider it did not affect the presumption of validity.

That brings us to the question of whether or not Brainard was obvious to one skilled in the art in view of the prior art discussed above. We conclude that it was not. We turn to a determination of whether Brainard was anticipated by the Hughes prior art and while we are at it, look at the Hughes nonpublic prior art. *e. g.*, drawings and reports in the Flexomatic Project. This bears on the level of ordinary skill in the art. For the most part such testimony and other proof is difficult to separate from that pertaining to defendants' contention that the Brainard invention was derived from Hughes Aircraft. Hence we will discuss them together.

We begin by noting that around 1953 Hughes Aircraft Company was an industrial giant (weapons systems) in transition. As pointed out by Cincinnati (proposed findings, p. 105), years of research in weapon systems such as missile guidance and radar, as well as data processing, had brought together a large group of highly talented scientists and engineers at Hughes. A decision not to compete with IBM in the commercial computer market produced a talent surplus at Hughes, and to retain that talent Hughes' management initiated research which included a machine tool development program. It is well to bear

in mind, as stated by the head of this project (r. 2488) that at Hughes they were electronically oriented and not sensitive to what might be patentable in the machine tool field. Also the head of the project at Kearney and Trecker which produced the Milwaukee-Matic II was Wallace Brainard who was an important member of the Hughes team at Hughes Aircraft from 1949 to February of 1956.

20. The tremendous scope of the research and development project at Hughes to apply numerical control to machine tools cannot go unnoticed. The Hughes exhibits numbering in the hundreds point out clearly what enormous effort and what brilliant scientific talent went into this effort. The earliest exhibit we can find is dx 755, dated February 15, 1954, prepared by Wallace Brainard, then assistant to the head of the Manufacturing Division (Division 16) at Hughes. It demonstrates the knowledge and skill of Mr. Brainard and the work already done at that point in time at Hughes in research and development to the breadboard testing stage of Brainard's Magpie project. Management at Hughes had initiated and encouraged such projects and the Magpie program evolved into a development later known as Automatex, which, in its turn, was broadened and redeveloped into the Flexomatic project, which was the project involved in the joint venture with Kearney & Trecker.

The skill of the people working on these projects to use numerical control in the best way to create a fully automatic machine tool is set out, for example, in dx 390, dated March 28, 1955, in a report and projection of future goals prepared by Michael May, Senior Technical Staff at Hughes. He lists the personnel then available to work on the project. We incorporate that list here:

J. V. Blankenbaker—Responsible for the logical design of the HAC data processor.

D. L. Curtis—(after termination of present commitments) Responsible for the circuit designs in the HAC data processor.

D. C. Hierath—Staff engineer. Designer and project engineer for the machine control equipment being designed in digital systems and control department. Twenty-six years electrical engineering experience.

R. R. Johnson—Ph.D., Cal. Tech. expected June 1955. Digital computer, logical design and systems engineering experience.

T. T. Kumagai—Digital computer design experience; systems engineering experience. Logical design of the HAC printer.

W. C. Leone—Ph.D. Carnegie Tech. Professor of Mechanical Engineering Section Head at HAC, Control Engineering Section.

In fact, he was *the* machine tool man on the Hughes team and played a major role in Hughes' decision to get into numerical control of machine tools in the first place. It was his idea to build a line of three machines—the project to which Hughes committed itself.

The Hughes project was broad and intense.[20] In due course it came up with the "Flexomatic" *line* of machines

M. Phister—Ph.D., Cambridge. Digital computer, logical design and systems engineering experience.

A. D. Scarbrough—Ph.D., Cal. Tech. expected June 1955. Transistor digital computer project leader at HAC.

H. L. Shoemaker—Section Head, Digital Systems Section. Responsible for the system engineering, logical design and circuits for the HAC Data Processor.

Coming into the project as heads later we find such people as Dr. Raymond Griest, with Ph.D.s in three fields—electrical engineering, mathematics and physics; William Wagenseil, DSE in Mathematics, lecturer in physics at UCLA, inventor for Bell Laboratories with patents on telephone switching from 1936–1950; Dr. William Leone, previously mentioned on Mr. May's list, now a V.P. of Rheem Mfg.; Dr. Rollin M. Russell, on the policy board for Hughes and later a Vice President, with a long background of research in applied sciences; Dr. Lawrence A. Hyland, Vice President and General Manager of Hughes Aircraft since 1954, with an outstanding background of scientific achievement and awards (dx 397).

Dr. Hyland was in overall charge of the automation program at Hughes and his testimony (tr. Vol. 19), as well as the testimony of Dr. Griest (tr. Vol. 22), that of Dr. Russell (tr. Vol. 30) and that of William Wagenseil (tr. Vols. 16–18) and of Dr. Leone (tr. Vols. 11–15) show the depth and breadth of the work done at Hughes. This testimony also shows that after the joint venture was begun with Kearney & Trecker, the Hughes team was very much in the picture, continuing to study, work out details, and planning and designing in furtherance of the joint project. See, *e. g.*, the monthly status reports of Wagenseil to Russell (dx 100, *et seq.*); and see, *e. g.*, the exchanges between Dr. Leone of Hughes and Joerger and Hansen of Kearney & Trecker (dx 154, *et seq.*).

It is noteworthy also that throughout the program, from the Magpie onwards, Wallace E. Brainard was in a peculiarly important position. He was in on the earliest developments and explorations at Hughes and continued in an inventive and executive capacity

shown in the sketch on page 1077 and disclosed (but not claimed) in the Kumagai patent (dx 7) referred to above in the discussion of prior art. It is also shown in some of the key exhibits, e. g., dx 20, one of the voluminous reports on the Hughes project (which, incidentally, shows its scope). As shown in the sketch there are three machines. One is a milling machine; one a drilling machine; and the third a boring machine. In front of each there is an index table, a table which would hold the pallet on which the work was mounted and which indexed so that four sides are exposed to the machine itself. There is a transfer mechanism so the pallets can be transferred from table to table (r. 1776). Also there is a conveyor system for bringing the parts around from one end of the line to the other. (For additional detail, see r. 1777, et seq.)

The main thing is that the middle machine had tool changing or spindle changing. The tools are housed in a drum which was made to rotate automatically so whichever tool was selected could be pushed out or extended. The tool and tool holder were extended into the spindle and when the drum was being rotated to select the next tool, the means for driving the spindle was not attached (r. 1799). While one tool was being driven, the other tools would be stationary and retracted (r. 1800). When one tool in a spindle was through machining a hand-arm device returned the tool to the drum, and them with the tools retracted, the drum rotated to present a new tool in the spindle to the hand-arm device, and then the hand-arm device extended the new tool in the spindle out of the drum into the machining zone for the next operation (r. 1801).

I recognize there is a means of controlling the conveyor system and pallets by coding the pallets (see dx. 20; r. 1846, et seq.) but I am not persuaded that this or anything else about the Flexomatic line made the Brainard invention obvious to one skilled in the art.

Flexomatic I had a storage with a number of spindles, each spindle provided with its own tool, and there was

there until he left in February, 1956 and went to work for Kearney & Trecker, where, of course, he continued in the same field of machine tool automation, but on behalf of Kearney & Trecker.

In contrast to this fund of knowledge and skill in the art of numerical control of machine tools at Hughes and which Mr. Brainard personally possessed or could call upon while at Hughes, we note dx 149, a memorandum written by J. R. Joerger (B.S. Mechanical Engineering, 20 year K&T employee, then Sales Manager at K&T), dated November 22, 1955, regarding a visit by Mr. Brainard of Hughes to discuss an idea "they have for tape control machining processes." He ends by saying: "The entire idea appears to be nebulous, if not fantastic, . . . ." Morris L. Hutchens, Brainard's "boss" at K&T, asserted (tr. 9704, et seq.) that K&T had "done work in the numerical control area * * * back in 1943." But there is no documentation to support this that we can find, except that Mr. Sipek (Project Engineer for Flexomatic and Milwaukee-Matic) refers to "tracer controlled skin mills" which K&T produced in the period 1948–1954.

It is also of interest to note that ten months after the joint venture was in progress,

Joerger of K&T visited Hughes (dx 660) and reported on a demonstration "covering the single axis control of a No. 2 K&T Horizontal Mill." This machine had been converted to numerical control at Hughes for their own purposes (to prove the feasibility of their control system) (Leone, tr. 1891–93). Mr. Joerger comments the demonstration was a success, and "[a]fter seeing this performance, I am certain that they will not have many problems in making any overall system operate." He recognizes that Hughes thinks K&T is going to have a large engineering staff available for this type of proposal work. I might note that as an organization K&T has a very ordinary proposal section in the past." He also notes that "K&T is becoming less important to Hughes each day. Don't think for one minute that they are dependent on us, because our contribution to this program so far has been a bare minimum." Another member of the K&T "team," I. R. Gregor reports in dx 663 his impressions following a visit to Hughes in November of 1956 (11 months after the contract was signed) and in this comprehensive report and analysis it seems evident that indeed K&T has up to this time contributed a "bare minimum."

April 12, 1966　　　T. T. KUMAGAI ETAL　　　3,245,144

TOOL CHANGER PRODUCTION LINE

Filed March 10, 1959　　　　　　　　222 Sheets—Sheet 1

*Fig. 1.*

INVENTORS,
TOM T. KUMAGAI,
WILLIAM C. LEONE,
MICHAEL MAY,
HAROLD L. SHOEMAKER
ROY A. HOWARD

BY *E. L. Oberheim*

AGENT

nothing on the machine which could place a tool in the spindle or take a tool from storage. As pointed out by the plaintiff (main brief, p. 50) defendant fails to recognize the big distinction between a structure in which the selected and driven tool remains at all times in the magazine, and a structure in which the selected tool is removed from the magazine and transported to and placed in a spindle.

The design of Milwaukee-Matic II may have resulted from a research project which was an outgrowth of the Flexomatic I project. It is to be noted there was a Flexomatic II project, and designing connected with Flexomatic II started a year and four months prior to the time Flexomatic I was placed in operation (r. 4568). In the depositions, in reports and in testimony in Court the designations Flexomatic I and Flexomatic II and Milwaukee-Matic are used interchangeably (r. 4575–9; and see testimony of Wagenseil, Leone, Russell, footnote 18, *supra*).

There were one hundred people engaged at Hughes on the Flexomatic project. The level of their competence, as well as that of those of ordinary skill in the milling machine industry was high. Initially there was a policy at Hughes of not trying to invent anything along mechanical lines. However, somewhere along the way it was thought by some that Hughes might be making such inventions and the patent department of Hughes was contacted but it was apparently too busy on other things to do anything much about it. In any event there were no mechanical patents obtained by Hughes. It was thought (but not proved) by some engaged in the project that ideas which belonged to Hughes were taken by departing engineers and resulted in mechanical patents issued to such engineers or their new employers.[21]

21. For example, on October 21, 1955, Wallace Brainard wrote in a detailed report to his superior Parkhurst: "Raymo Woolridge is probably working on automatic control and is probably aware of everything HAC [Hughes] has conceived. We have had a periodic transfer of people intimately familiar with our work to R. W."

William Wagenseil, Hughes executive, states in his deposition, at r. 2485–90: "The organization which became Industrial Systems and Controls [the Hughes side of the Kearney & Trecker-Hughes joint venture] had previously been working on computers of the data-processing and computation type. In the course of this work they developed a number of concepts, some of which were patented and some of which were not, which really became standards in parts of the industry. This occurred as the people left Hughes and took the information with them. * * * The Hughes patent people would not prosecute people who stole the Hughes patents. * * [P]eople departing from Hughes tended to take their information with them and the control on the departure of information from Hughes was very poor."

The testimony of John A. Hansen (tr. Vols. 31–32) seems to indicate that Hughes invented nothing and that all inventions on the Flexomatic line were made at K&T. It must be noted that K&T obtained patents on inventions made on the Flexomatic line. Mr. Hansen asserts: there were no mechanical engineering people at Hughes except a few assistants; there was no one in overall command at Hughes who was an expert in the field of machine tool automation (tr. 5707, *et seq.*). Mr. Hansen was not even sure where the idea for a three-machine line came from; he thought perhaps that was a K&T idea, too. He had "no experience at that time in numerical controls" (tr. 5481).

Throughout the testimony of Mr. Wagenseil, Dr. Russell, and Dr. Leone and others there is mention of Hughes' getting something done to obtain patent coverage on inventions which they "felt sure" were being made by Hughes people during the Flexomatic project with K&T. See, e. g., px 231, in which Dr. Leone described to Hughes' patent counsel some of the concepts he believed Hughes should patent. These included "joint patent participation [with K&T personnel] in both mechanism and control" on the drilling machine drum indexing functional diagram; drilling machine elementary diagram sheet No. 4. As to drilling and tapping functional diagram, he says: "HAC should file separately on the drill spindle and tapping spindle mechanical design. The original design was HAC's, including a three-speed gear box, jaw clutch coupling, hydraulic feed on drill, lead screw tapping, stationary drill bushing attached to quill, position control on drill depth, and limit switch control on tapping spindle." As to "Boring head-two spindle," he says: "both the general configuration and the means of

The defendant claims Brainard did just this; that he got the whole idea for the Brainard patent from Hughes. The defendant claims that Brainard appropriated the idea from Hughes and slyly led his research team along lines of inquiry that made it appear the members of his team at Kearney & Trecker invented what was really invented at Hughes. Hughes never made such a claim.

We find the defendant has not established this claim.

". . . Any claim of that kind tending to destroy the originality of the patentee, before it can be entertained by the court, must be shown by very convincing and strong evidence. It is well recognized that the memory of man is not sufficient to meet that test. There must be something more tangible. We look for records that fix dates, a very definite sort of thing to tie to, and I do not find that in this case." *Fruehauf Trailer Co. v. Highway Trailer Co.*, 54 F.2d 691, at 702 (E.D.Mich., 1931, Tuttle, J.)

And in *Young v. General Electric Co.*, 96 F.Supp. 109, 138 (N.D.Ill., 1951), we find:

". . . The Court is not unmindful of the high degree of proof required on the part of a defendant who contends that the patentee named in a patent was not in fact the inventor."

See also, *Becton-Dickinson & Co. v. Robert P. Scherer Corp.*, 106 F.Supp. 665, 675 (E.D.Mich, S.D., 1952), where the

Court held that proof that persons other than the patentee made the invention must be beyond a reasonable doubt, citing *Washburn & Moen Mfg. Co. v. Norwood (Barbed Wire Patent)*, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154; *Drum v. Turner*, 219 F. 188 (8 Cir. 1914). *Young v. General Electric Co., supra*, is also cited.

To summarize, we find that nothing at Hughes anticipated the Brainard invention. As stated above, we also find that the Brainard invention was not derived from Hughes. By the same token we find and/or conclude that failure to cite the Hughes prior art was not fraud on the Patent Office. In our opinion the derivation claim was seriously made. Though it did not prevail, it served the purpose of putting the Brainard patent in perspective, thus enabling the Court to determine that Brainard is something less than a pioneer patent, as noted later in this opinion in the discussion of infringement. The "pioneering" in this instance is believed to have occurred mainly in the field of mathematics, numerical control, electronics, etc. At least the advances on those fronts were a necessary prelude to the Brainard patent, a mechanical patent, which "put it all together" as far as multi-purpose machine tools with tool changers was concerned.

Lastly, while much of the evidence on the derivation shows that the level of ordinary skill in the art was high there is nothing to indicate that the Brainard invention would have been obvious to ordinary persons skilled in the art.[22]

tool radius control are exclusively HAC's." However, Dr. Leone was never contacted about what was or was not to be patented by Hughes or what his or others' contributions were (tr. 2170). Dr. Leone, in answer to the question about what K&T added to the Flexomatic machine as built, said: "Nothing." (tr. 1855–57).

22. While nothing at Hughes made Brainard obvious, perhaps it should be noted that at Hughes the idea of a hybrid or single machine existed in 1956 according to Mr. Wagenseil and was worked on on the *q. t.*

without official sanction (r. 2355). K&T was the customer in mind and their requirements as to drill speed, tolerances, etc., were more severe than their requirements for the first set of machines (r. 2355). Wagenseil indicated the thought of a hybrid machine with simplified controls providing all the table motions in a simple table with the different cutters approaching it was not unique to him but was "sort of a general discussion of these kinds of problems" (r. 2357). He made personal sketches of a machine he believed would be reasonably versatile and a lot cheaper than the Flexomatic line (r. 2358).

*Morgan is anticipated by Sulzer*

The state of the art relied on by the defendant as anticipatory is set out in a revised notice filed herein—June 15, 1970—and includes the Sulzer patent 2,363,202. It is only necessary to determine whether Sulzer anticipates original claim 10 of Morgan, because the other claims in suit are reissue claims and void for fraud on the patent office, just as claim 10 is unenforceable for the same reason.

Claim 10, though already quoted in footnote 7, bears repeating. It reads:

"10. A data programmed machine tool comprising a data storage medium containing data respecting the operation of said machine, data reading means for said medium, and a tool storage matrix operable in response to said reading means for interchanging selected tools with said machine."

Morgan accomplished bodily removal of the tool from the matrix into position under the spindle and the use of a wrenching device to secure it in the spindle. Sulzer brought the tool into position by rotating a turret in which the tool was located to the work piece.

Defendant correctly notes (defendant's main brief, p. 17) that according to the testimony of plaintiff's own expert, Dr. Harrington (r. 431–432, px 126) the Morgan claim calls for only three elements: a data storage medium which is the record card 10; data reading means which is the card reader 11; and a tool storage matrix 27 (Morgan patent, dx 244).

An examination of the Sulzer Patent 2,363,208 (dx 827, tab 3) shows that the object of the Sulzer was:

". . . [A] control device for a material working machine having operable material working tools and an adjustable carriage for material mova-

ble relative to the tools, the control device including an element adapted for determining the nature of a plurality of operations to be performed by *selected ones of the tools* at given positions on the material, and other means controlled by the element for successively and automatically initiating the operations." [Emphasis added.]

A number of the claims, *e. g.*, claim 1, show part of the patent was a control device with an element adapted to position a selected tool adjacent to a given point of the material and means to cause actuation of the selected tool.

The Court finds that Sulzer anticipates Morgan claim 10. The Court also concludes that Morgan claim 10 is overly broad.

This view of the invalidity of claim 10 in view of Sulzer (and I think for overbreadth) was held and asserted by plaintiff when it was considering taking a license from IBM on Morgan and considering whether to acquire Morgan. In a report letter dated September 29, 1962 (dx 1019), its consultant Mr. Beall said:

". . . claim 10, however, is clearly invalid in view of Sulzer 2,363,208, which fully meets the claim."

That opinion was elicited in connection with the acquisition of Morgan. Another opinion relative to reissuing Morgan (June 10, 1963) (dx 1021) contained the enlightening statement:

"If the original patent was not reissued and subjected to court action, the broad claims, in all likelyhood [*sic*], would be held invalid, or, at the best, held restricted to the particular Morgan machine."

These and other documents show that officials of the plaintiff initially held the view and asserted that Morgan claim 10 was too broad and was invalid in view of Sulzer.[23] The fact that claim 10

---

However, no money was appropriated for this (4. 2376). Wagenseil was just "trying to look ahead and anticipate when they [Hughes] would finally come around to my point of view." (r. 2376).

23. See defendant's main brief, p. 66, footnote 84, as follows:
"Conclusions of invalidity of the Morgan 'invention' appear in a letter of Mr. Wutschel to Mr. Dewey J. Cunningham of IBM, dated

was too broad and invalid on the prior art looms large in the discussion incident to holding the reissue claims in suit invalid and claim 10 unenforceable. Defendant claimed other prior art anticipatory of Morgan; also that the Morgan "invention" was obvious and invalid because of prior public use under 35 U.S.C. § 102(b). We consider it unnecessary for the Court to address itself to questions raised by these contentions in view of the foregoing.

Defendant would have this Court declare as to the validity of the Brainard shuttle patent 3,099,873 (dx 11) and all other claims of the Brainard patent Re. Re. 25,737 (dx 10), even though there is no claim they are infringed and even though both the shuttle patent and all the reissued Brainard patent claims have been disclaimed. We do not believe it is necessary to do so, in view of the holding that the original Brainard claims carried into the reissue application are unenforceable and the reissue claims themselves are invalid.

We recognize that ordinarily the Court would have to pass on the validity of all the claims of Brainard, Morgan and the Brainard shuttle patent where, as in this case, the defendant filed a declaratory judgment requesting a decision as to the validity of all such claims before plaintiff withdrew claims in the complaint that claims in all three patents were infringed. *Sterling Aluminum Products v. Bohn Aluminum Corporation*, 187 F.Supp. 879 (E.D.Mich., 1960), aff'd 298 F.2d 538 (6 Cir., 1962). However, we conclude this is not necessary where such claims are void or unenforceable because of fraud on the Patent Office.

## INFRINGEMENT OF BRAINARD, et al., PATENT No. Re. Re. 25,737

Plaintiff has the burden of proving that the defendants' machines infringed the valid claims of the Brainard patent in suit (claims 19, 20, 21 and 24) (claim 33 is not infringed) has been admitted that the plaintiff is the record owner of the Brainard tool changer patent. Infringement is the only issue as to which the plaintiff has the burden of proof. *Becker v. Webcor, Inc.*, 289 F.2d 357, 360 (7 Cir., 1961); *Kearney & Trecker v. Giddings & Lewis*, 306 F.Supp. 189, 193 (E.D.Wis., 1969) rev'd on other grounds, 452 F.2d 569 (7 Cir., 1971).

In determining whether a patent has been infringed by an accused device, two tests must be applied. The first determination to be made is whether there is literal infringement of the patent. In making this determination, the words of the claim in the patent must be compared with the accused device. If the accused device is clearly within the claim, then infringement does exist. *Graver Mfg. Co. v. Linde Co.*, 339 U.S. 605, 70 S. Ct. 854, 94 L.Ed. 1097 (1950).

The second test is the application of the doctrine of equivalents. The Supreme Court explained this doctrine in *Graver, supra:*

"[A] patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function' in substantially the same way to obtain the same result.' *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147. The theory on which it is founded is that 'if two devices do the same work in substantially the same way,

March 30, 1962 (DX–1095, tab 36); a memorandum of Mr. Beall to Mr. Wutschel, dated September 29, 1962 (DX–1019; 1095, tab 37); a letter from Mr. Wutschel to Mr. Beall, dated October 5, 1962 (DX–918; 1095, tab 38); a letter from Mr. Wutschel to Mr. G. E. Birchfield of IBM, dated October 17, 1962 (DX–919; 1095, tab 39); a letter of

Mr. Wutschel to Mr. Trecker, dated February 18, 1963, referring to three opinions including one of Mr. W. C. Gleisner of June 1, 1960, not in evidence (DX–686; 1095, tab 39A); and a letter from Mr. Beall to Mr. Wutschel, dated March 28, 1963 (DX–921; 1095 tab 42).

and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.' *Machine Co. v. Murphy,* 97 U.S. 120, 125, 24 L.Ed. 935. The doctrine operates not only in favor of the patentee of a pioneer or primary invention, but also for the patentee of a secondary invention consisting of a combination of old ingredients which produce new and useful results, *Imhaeuser v. Buerk,* 101 U.S. 647, 655, 25 L.Ed. 945 although the area of equivalence may vary under the circumstances. [Citations omitted] The wholesome realism of this doctrine is not always applied in favor of a patentee but is sometimes used against him. Thus, where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement. *Westinghouse v. Boyden Power Brake Co.,* 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136." 339 U.S. at 608–609, 70 S.Ct. at 856.

*Acme Highway Products Corp. v. D. S. Brown Co.,* 6 Cir., 473 F.2d 849, at 850–851.

We do not find this to be a correct statement of the law. In determining whether equivalence exists in an accused device, a court must not emphasize form over substance. *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Laitram Corp. v. Deepsouth Packing Co.,* 443 F.2d 928, 933 (5th Cir. 1971). "If two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape." *Graver, supra,* 339 U.S. at 608, 70 S.Ct. at 856; *Machine Co. v. Murphy,* 97 U.S. 120, 125, 24 L. Ed. 935 (1877). We find that the District Court incorrectly applied the doctrine of equivalents to Appellant's patent. The Supreme Court in *Graver* went on to say:

"What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." 339 U.S. at 609, 70 S. Ct. at 856.

*Id.,* at 854.

An inventor is entitled to a range of equivalents commensurate with the scope of his invention. *Id.,* at 855.

### Defendant's Machines

The defendant's machines are described in detail in plaintiff's post-trial brief: the ATC at pp. 15–19; the CIM-Xchanger at pp. 24–26; and the Cintimatic horizontal tool changer at pp. 30–33. See also, plaintiff's proposed findings 26 (ATC); 25 (CIM-Xchanger); and 28 (Cintimatic).

At trial the ATC machines were described by Dr. Harrington (tr. Vol. 2, pp. 459–469) and by Lewis A. Dever of

Cincinnati (tr. Vol. 9, pp. 1501–1505). Suffice it to say here that they are the same as the Milwaukee-Matic with two important differences. Like the Milwaukee-Matic II, the ATC machines are horizontal spindle multi-purpose machine tools equipped with numerical control and an automatic tool changer. However, the tool storage magazine is mounted on the rear of the column and the magazine has a plurality of spaced slots which accept coded tool holders containing different cutting tools. Also, the ATC machines, because of the position of the storage drum employ a single arm as well as a double arm, the function of the single arm being to move selected tools from the magazine to the front of the machine where they may be grasped by the double arm.

The CIM-Xchanger was described by Dr. Harrington (tr. Vol. 2, pp. 481–485) and by Mr. Dever (tr. Vol. 9, pp. 1510–1512). Like the Milwaukee-Matic, the CIM-Xchanger is a horizontal spindle multi-purpose machine tool equipped with numerical control and automatic tool changer. The CIM-Xchanger is like the Milwaukee-Matic except that the latter has coded tools and the CIM-Xchanger employs numbered sockets in the tool drum, and it is the responsibility of the operator to put the correct tool into the correct numbered socket. Hence, a cutting tool is selected by selecting a magazine position into which the tool has been previously loaded with the magazine being rotated to search for the desired magazine position called for on the punched tape. There is another difference, and that is that the CIM-Xchanger employs a single-ended intermediate transfer arm within the tool drum inside the circle of cutting tools, and this arm is capable of getting the selected tool into an interchange station socket (plaintiff's brief, p. 25). Then the arm retreats into the tool drum so that the drum may be reindexed (*id.*).

The Cintimatic horizontal tool changer was described at trial by Dr. Harrington

(tr. Vol. 2, pp. 296–508). Also by Stanley A. Pfister of Cincinnati in his deposition (tr. Vol. 2, pp. 341–344). See also px 176. Like the Milwaukee-Matic the Cintimatic tool changer is another horizontal spindle multi-purpose machine tool with tool changer under numerical control but it is structurally different from the Milwaukee-Matic and the others. On the same "saddle" on which is located the spindle carrier there is a tool storage unit and an interchange mechanism consisting of two arms mounted in front of the storage unit. The storage unit has two parallel rows of storage station, each having a removal pot which is held in finger-like support that extend from the sides of the unit. There is an aisle down the center of two rows of storage stations to accommodate a tool cart which moves a pot with the tool and tool holder contained therein between its storage station and a storage transfer spot which is located to the end of the storage unit near the interchange mechanism. When a new tool is selected by the tape the cart responds by moving to the position of that station in the storage unit, removes the pot including the tool contained therein, and transfers it to the tool transfer spot. This can occur while a previous tool is being used by the spindle and when interchange is desired, the spindle moves into a position for tool change and fingers on the end of each of two interchange arms are closed, one arm grasping the tool in the spindle and the other arm grasping the tool in the tool transfer spot. Of course, after that the spindle releases the tool held therein and the interchange arms pivot to withdraw the tools from the transfer spot and from the spindle. They rotate 180° to exchange the positions of the arms, make the insert; the fingers are released and, while machining takes place with the new tool, the cart will move the previously used tool from the transfer spot back to its station in the tool storage unit.

Claims 19, 20, 21 and 24 (also claim 33, but it is not infringed) of Brainard,

*et al.,* patent Re.Re. 25,737 [24] are relied upon by plaintiff as being infringed.

These claims are among the 35 claims which were issued in the original patent No. 3,052,011.

Of course, the defendant has made, used and sold the ATC, CIM–Xchanger, and Cintimatic machines. The ATC machines were first offered for sale in 1961 before a machine was in existence and the first ATC machine was shipped to a customer in April, 1963. The CIM–Xchanger machine was publicly introduced and offered for sale on March 11, 1968. The Cintimatic horizontal tool changer machine was first offered for sale in 1969. At the time the case was submitted the defendants still offered each of said machines for sale. All such machines are multi-function machine tools with a tool changer in which the next tool to be used can be preselected and placed in a position for change, so that when it is time for a tool change to occur the selected tool and the previously used tool may be simultaneously grasped and removed from their respective positions and quickly interchanged.

The plaintiff contends that the accused machines thereby adopt a significant contribution which has been made

24. 19. In a machine tool having a frame and an operating station which is provided with tool securing and operating means; tool storage means carrying a plurality of tools; selection means operative to select a desired tool in said tool storage means for placement in said tool [holding] securing means; a tool change arm rotatably carried by said frame and operable when rotated to replace a tool in said tool [holding] securing means with the selected tool from said storage means; and a source of power connected to rotate said tool change arm for transferring the tools into and out of said tool [holding] securing means.

20. In a machine tool having a frame and an operating station which is provided with tool securing and operating means; tool storage means carrying a plurality of tools; a tool ready station disposed to selectively receive said tools; selection means connected to select the desired tool in said tool storage means for placement in said operating station; transfer means operating under the control of said selection means to transfer a desired tool in said tool storage means into said tool ready station; a tool change arm rotatably carried by said frame and operable when rotated to transport the tools between said tool ready station and said tool [holding] securing means for replacing a tool in said tool [holding] securing means with the selected tool from said tool storage means; and a source of power connected to rotate said tool change arm for transporting the tools between said tool ready station and said tool [holding] securing means.

21. In a machine tool having a frame and an operating station provided with tool holding and operating means; tool storage means carrying a plurality of tools for placement in said tool holding means selectively; a tool ready station for individually receiving said tools selectively; selection means connected to select the desired tool in said tool storage means for placement in said operating station; power operated transfer means operably connected to transfer the desired tool in said tool storage means into said tool ready station; control means responsive to said selection means to regulate the operation of said transfer means for moving the selected tool into the tool ready station while a machining operation is being performed at the operating station; a tool change arm movably carried by said frame and operable to transport the tools between said tool ready station and said tool holding means for replacing a tool in said tool holding means with the selected tool from said tool storage means; and a source of power connected to actuate said tool change arm for transporting the tools between said tool ready station and said tool holding means.

24. In a tool change mechanism for changing the tools in the tool head of a machine tool; a frame; tool storage means carrying a plurality of tools; a tool selector for selecting the desired tool in said tool storage means; a tool change arm supported by said frame for rotational and translational movement; a pair of carriers mounted to move with said tool change arm and adapted to couple the tools to said tool change arm for movement therewith; a source of power connected to drive said tool change arm in its rotational and translational movements; and control means operably connected to regulate the operation of said source of power to produce the unitary movements of said tool change arm and said carriers in sequence for engaging and removing the tool in the tool head for placement in said tool storage means and transferring the selected tool to the tool head and operably placing it in the tool head for the performance of a succeeding machining operation.

to machine tool art by the Brainard, *et al.*, tool changer invention. (See plaintiff's proposed findings No. 79 and plaintiff's brief, pp. 37–40.)

Resolution of that contention requires a determination of what the "contribution" of the Brainard invention was. This could be the most important question in this case, were it not for the fact that the Brainard patent was rendered unenforceable for fraud on the Patent Office. It is also a difficult question because the assessment of the "contribution" requires an analysis of the Hughes evidence, such as that appearing in the discussion herein of defendant's claim that Brainard, *et al.*, was stolen from Hughes, and especially in footnotes 18, 19, 20 and 21. These not only serve to show defendant's derivation claim is seriously made but affords the basis for the Court's conclusion that Brainard, *et al.*, is something less than a "pioneer" patent. This material—the Hughes evidence—gives us a bird's-eye view of the history of the art of tool changing. It and other evidence give the Court an idea of the chronology of the development of numerical control of milling machines and give an excellent idea of the state of the tool changing art about the time of the development of the Brainard, *et al.*, invention. It also is of vast importance as background against which to view the conclusion of Judge Stevens in *Giddings & Lewis* that Kearney & Trecker was guilty of cardinal sin in its abuse of the privilege which amounted to using the patent as a "beachhead" from which to extend the monopoly of the patent to every conceivable kind of milling machine with an automatic tool changer.

Suffice it to say here that this Court concludes that in light of the history of the development of numerical control and automatic tool changing, and especially in light of what led up to the

Brainard, *et al.*, invention, the invention is " . . . the latest and most successful step in the art theretofore partially developed by other inventors in the same field." 7 A. Deller, Deller's Walker on Patents, § 554, p. 352 (2d Ed., 1972), citing *Morley Sewing Machine Co. v. Lancaster*, 129 U.S. 263, 9 S.Ct. 299, 32 L.Ed. 715 (1889). As this suggests there were many steps before, most of which were in the art of numerical control, which due to experiment and improved mathematics was becoming increasingly capable as a means of control of mechanical functions. We have already indicated that the Brainard, *et al.*, invention resulted in a truly remarkable machine, but it was the outgrowth of research projects at Hughes, though not derived therefrom.

As can be seen from the Hughes exhibits and testimony, a survey of the field of machine tool manufacturers was made and Kearney & Trecker was selected as the manufacturer with which Hughes entered into a joint venture for the development of its line of machines not only because of K&T's potential, but, in part at least, because K&T was lagging[25] in the field of numerical control. Its team which developed the Brainard, *et al.*, invention would not have gotten to first base without the knowledge and expertise which Brainard brought over to K&T from Hughes, knowledge gained as a result of his long-time interest and prominent role in the Hughes project to develop controls for milling machines.

For the purpose of this case we do not think it necessary to determine the exact range of equivalents to which the Brainard, *et al.*, invention is entitled, because by any standard the defendant's ATC machine infringes the Brainard invention. It is, in plain words, a "dead ringer" for the Brainard invention. As recognized by defendant's counsel early in

---

25. See Dr. Hyland's testimony at r. 3131: " . . . Kearney & Trecker was a little bit behind the parade at that time and we felt that their milling machines were pretty good, but they had no—had made no progress or attempted progress on automatic controls. And we felt there might be a pretty good association because they had no interest at the time in this sort of thing."

the game, the alteration of the tool changer arm to split the function between two separately pivoted arms would not "materially enhance the basic defense of noninfringement" (px 317, dated December 14, 1962). As to the ATC machine this Court concludes that the use of position coding instead of tool coding does not take the defendant's ATC machines beyond the scope of the range of equivalents of the Brainard, et al., invention.[26] A determination of whether the range of equivalents of Brainard, et al., is such that it is infringed by the defendants Cintimatic machine and CIM–Xchanger machine was found more difficult, and, in any event, unnecessary to decide, in view of the invalidity of the Brainard, et al., patent for fraud on the Patent Office. We only felt it necessary to determine whether one of the machines infringed. Otherwise it would not have been necessary to consider whether to follow the far-reaching decision of the Seventh Circuit in the *Giddings & Lewis* case. Having said that it may be unforgiveable to go on, but we nevertheless note that defendant's CIM–Xchanger is also a "look-alike" to Milwaukee-Matic II.[27] The differences are such that we concluded that even giving the Brainard, et al., invention a narrow range of equivalents the defendant's CIM–Xchanger infringed the Brainard, et al., invention.

We did not reach any conclusion as to whether the defendant Cintimatic infringed claims 19, 20 and 21 of the Brainard invention.[28] However, we incline to the view that though there is identity of function present, since the patent is not a primary one, there are important differences in the manner of operation of the defendant's Cintimatic with its pot that runs up and down between two rows of stored tools and the Milwaukee-Matic II machine. See 7 A. Deller, Deller's Walker on Patents, § 553, p. 349 (2d Ed., 1972), citing *Chicago Forging & Mfg. Co. v. Bade-Cummins Mfg. Co.*, 43 F.2d 928, 931 (6 Cir., 1933).

One can only conclude that defendant has tried to design around the Brainard invention and we are not sure that isn't their privilege.

Even a limited discussion of the scope of the Brainard patent would not be complete without noting that it does not cover the concept of a two-handed arm or coded tools because neither was claimed. This was why Kearney & Trecker decided to apply for a reissue patent in order to have it cover such concepts and thereby broaden the scope of the patent.[29] *Giddings & Lewis, supra,* at 595. Of course, even the original claims (including the ones in suit) became unenforceable because of fraud on the Patent Office in connection with the reissue-applications, but what is important to note at this point is that the attempt to broaden the patent by including the concepts of the two-handed arm and tool coding drew strong words from Judge Stevens in *Giddings & Lewis* which led up to his statement that a patent is not a "beachhead" from which to conquer territory not covered by the monopoly (or at least we think this may be so).

It may also be worth noting that the defendant's patent counsel in a Decem-

---

**26.** For the exhibits which show the structure of the ATC machines compared to the elements of Brainard, et al., claims 19, 20 and 24 see dx 158, 159 and 160.

**27.** For the exhibits which show the structure of the CIM–Xchanger compared to the elements of claims 19, 20 and 24 of the Brainard invention, see defendants' exhibits 173, 174 and 175.

**28.** For the exhibits which show the structure of the Cintimatic machines compared to claims 19, 20 and 21 of the Brainard, et al., invention, see dx 182, 183 and 184.

**29.** See Hamburg, Patent Fraud and Inequitable Conduct (Clark Boardman Company, Ltd, N. Y. (1973)) § 4.01[3], p. 4–34:
"Neither of these concepts was expressly identified in the patent claims of plaintiff's patent in issue, the Brainard patent. These two concepts, however, were regarded to clearly differentiate plaintiff's machines from the principal prior art, namely, a patent to one Morgan of IBM."

ber 14, 1962, memo (px 317A) concluded that:

> "Thus, the scope of the Brainard et al patent must be severely limited in order to save the claims from invalidity." (Px 317A, p. 3.)

This was based on the view that Morgan and patents such as Carlson 2,782,689, covered successive placing of workpieces in position for being picked up and redeposited by a change arm, and therefore:

> ". . . the scope of legitimate claim coverage by subsequent patents involving numerically controlled automatic tool changers must necessarily be greatly restricted." Px 317A, p. 3.

Even if the limitation must be "severe," which we doubt, we find infringement of the Brainard, *et al.*, patent by at least two of the accused machines, the ATC and the CIM–Xchanger.

## V.

## ANTITRUST AND ATTORNEYS FEES

[redacted] In *Zenith Corp. v. Hazeltine*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), it was pointed out in the opinion of Justice White that the existence of patent misuse does not necessarily mean that there is an actual or threatened violation of the antitrust laws, citing *Transparent-Wrap Corp. v. Stokes Co.*, 329 U.S. 637, 641, 67 S.Ct. 610, 91 L.Ed. 563 (1947); *Morton Salt Co. v. Suppiger Co.*, 314 U.S. 488, 62 S.Ct. 402, 86 L. Ed. 363 (1942); *Laitram Corporation v. King Crab, Inc.*, 245 F.Supp. 1019 (D. Alaska, 1965). See, "Antitrust, 1969", Milton Handler, 55 Cornell L.Rev. 195–196 (1970). Under *Walker Process, supra*, the Court of Appeals in *Kearney & Trecker v. Giddings & Lewis, supra*, at 599, said:

> ". . . under our appraisal of the exclusionary power of the Brainard reissue claims that holding [that the enforcement of a fraudulently procured patent would give rise to a § 2 violation if the exclusionary power of the illegal patent claim in the relevant market for the product involved exceeded accepted antitrust criteria] persuades us that plaintiff has violated § 2 of the Sherman Act."

[redacted] It has been noted that in so holding *Giddings & Lewis* is the first case in which patent misuse has not only been successfully used as a shield but as a sword as well.[30] Nevertheless, we conclude on the authority of *Giddings & Lewis*, 452 F.2d 579, that the patent misuse itself was such as to constitute a violation of § 2 of the Sherman Act, 15 U.S.C. § 2.[31]

30. "When the infringer attempted to use fraudulent procurement as a sword as well as a shield, his efforts were less successful [than when fraudulent procurement was asserted as a defense]. The one exception found was the *Kearney & Trecker* case." Pugsley, "Fraudulent Procurement Today," 1972 Patent Law Annual, p. 30 (Matthew Bender). But see, *Acme Precision Products, Inc. v. American Alloys Corp.*, 347 F.Supp. 376 (W. D.Mo., 1972), rev'd 484 F.2d 1237 (8 Cir. 1973).

31. Section 2 of the Sherman Act (15 U.S.C. § 2) provides in pertinent part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . ."

Defendants also claim a violation of § 7 of the Clayton Act (15 U.S.C. § 18). It provides in pertinent part: "No corporation engaged in commerce shall acquire . . . the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

Defendants request treble damages and attorney fees under § 4 of the Clayton Act (15 U.S.C. § 15). It provides: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Of course, like the Court of Appeals in *Giddings & Lewis, supra,* at 598, this Court finds that plaintiff was a firm with the capacity to make a serious attempt to acquire monopoly status.[32] We also conclude, as the Seventh Circuit did, that the relevant market is the domestic market for "multi-function machine tools with automatic tool changers," 452 F.2d at 597, and agree with the Court's statement:

> "Plaintiff cannot deny that it intended to acquire the power to exclude competition from the portion of the market described in the broad claims of the twice reissued Brainard patent." Id., p. 598.

Finally, we agree with the conclusion of the Seventh Circuit that in the facts discussed under conflict of interest we find the use of predatory intent on the part of the plaintiff to accomplish its purpose. Id., p. 599.

Thus, we conclude there was a violation of § 2 of the Sherman Act (15 U.S.C. § 2).[33]

Cincinnati was not a customer of *Kearney & Trecker.* Hence, it has conceded that the antitrust violation had no impact on Cincinnati so as to give rise to antitrust liability except for the attorney fees which Cincinnati had to expend in defending this lawsuit. We conclude that attorney fees expended up to the time the reissue claims were abandoned by K&T constitute injury to business or property in the circumstances of this case [34] and provide the basis for an award of damages under the Clayton Act. 15 U.S.C. § 15. We proceed to a discussion of the pertinent cases.

The one "closest to home" is *Malta Manufacturing Company v. Osten,* 215 F. Supp. 114 (S.D.Mich.E.D., 1963). There District Judge (now Circuit Judge) McCree stated:

> "There is precedent for regarding attorney fees incident to defending a patent infringement action as an element of treble damages when a patentee enforces his patent rights for the purpose of furthering unlawful monopolistic activities, *Kobe Inc. v. Dempsey Pump Co.,* 198 F.2d 416, 425 (10 Cir., 1952); *Clapper v. Original Tractor Cab Co.,* 270 F.2d 616, 624 (7

---

32. Also see discussion by the Court of Appeals in *Bendix Corporation v. Balax, Inc.,* 471 F.2d 149 (7 Cir., 1973).

33. "By condemning attempts to monopolize, that section [15 U.S.C. § 2] directs itself against dangerous probabilities as well as the completed result." *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.,* supra, at 598. In footnote 44 the *Giddings & Lewis* Court quoted from *Swift & Company v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 as follows: "'But when that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result.'" Id.

34. In *Giddings & Lewis, supra,* at 600, the Seventh Circuit was "not at all sure" the defendant met the burden of showing injury to its business or property. 15 U.S.C. § 15. The case was remanded for such a determination and nothing was said about the cost of attorney fees and other expenses constituting such injury. Hence, Giddings & Lewis is not considered pertinent to this aspect of our discussion, *i. e.,* pertinent to the discussion as to when, if ever, attorney fees are

assessible as damages in an antitrust action. *Giddings & Lewis* after remand was presumably settled. However, in a reported case, a Court stated that Kearney & Trecker's damages were in excess of $4 million. *Beall v. Kearney & Trecker Corp.,* 350 F.Supp. 978, 980 (D.Md., 1972).

The Court of Appeals took note, as we do, of the District Court's conclusion that the original Brainard patent was valid when issued September 4, 1962, and stated that by then-presumably by virtue of the superior quality of its machine-plaintiff had already obtained a position of market leadership. The Court noted that it was not until after the reissue that the defendant Giddings & Lewis could "properly suggest that the *in terrorem* effect of the invalid claims obtained by reissue had any impact on its own research and development." *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.,* supra, at 600.

Along that line, there is nothing in this case to suggest *"in terrorem"* effect of the reissue claims had any impact on the defendant until this suit was filed September 14, 1965. The defendant in this case did not complain, as Giddings & Lewis did, of any sales pyramid constructed on the basis of an antitrust violation.

Cir., 1959), cert. den., 361 U.S. 967, 80 S.Ct. 588, 4 L.Ed.2d 547 (1960). But where a patentee enforces his rights for apparently lawful purposes the cost of defense does not become an element of damages under the Clayton Act. *Straus v. Victor Talking Mach. Co.*, 297 F. 791 (2d Cir., 1924)."

The Court found the case before it was brought for the purpose of enforcing the patent there in suit. Moreover, there was no history of monopolization on the part of the patentee preceding the patent litigation such as the Court found appeared in *Kobe* and *Clapper, supra.* The industry affected was that of removable sash—one in which competition was "vigorous" and there was no evidence, as there was no evidence in the *Giddings & Lewis* case, that the plaintiff gained an unlawful position of dominance in the relevant market.

The Court found *Dairy Foods Incorporated v. Dairy Maid Products Coop.*, 297 F.2d 805 (7 Cir., 1961), distinguishable because in *Dairy Foods* the Court, on motion to dismiss, assumed that the patentee brought suit to further unlawful monopolistic activities, since the defendant in that case alleged in his counterclaim that he was forced either to cease competition, to compete under a discriminatory license, or to defend the patent litigation.

In the instant case, as in *Dairy Foods,* the defendant, while the largest manufacturer of machine tools in the United States, as to automatic tool changing was faced with the same alternatives of either ceasing competition, competing under a license (though not necessarily a discriminatory license) or to defend the patent litigation.

The Court in *Malta, supra,* found that there was no evidence that the suits were brought in furtherance of an unlawful conspiracy.[35] That same finding cannot be made in this case. The Seventh Circuit found, in effect, that the patent—

the fraudulently reissued patent—would be used as a beachhead from which to conquer adjacent territory, and with that this Court states agreement. There was predatory intent up to the point where the reissue claims were dropped after discovery disclosed such were obtained in violation of conflict of interest principles. After that it cannot be said that K & T prosecuted this litigation in furtherance of a monopolistic scheme. But before that it not only can be said, but must be said. Thus, there was the required impact of the unlawful act on the defendants, and the attorney fees, up to the point where the plaintiff washed its hands, so to speak—defendants' attorney fees are assessible as damages which can be trebled.

In reaching this conclusion, we have not overlooked the fact that from the outset the defendants evidently followed a policy of ignoring the plaintiff's patents, concentrating, on the advice of counsel, on a search of the prior art.

Along this line, the fact that the defendant is the largest manufacturer of machine tools in the United States if not the world, and plaintiff is much smaller, has been noted. However, we have not been cited to any authority holding that this makes any difference to defendants' right to recover.

We conclude not only that the instant case is distinguishable from *Malta,* but it is more like the facts as found by the District Court in *Acme Precision Products, Inc. v. American Alloys Corp.*, 347 F.Supp. 376 (W.D.Mo., 1972), rev'd 484 F.2d 1237 (8 Cir., 1973). *Acme* was a patent infringement case in which there was an antitrust counterclaim. Such counterclaim was dismissed originally for failure of the defendant to prove plaintiff (who was not the original applicant) had any knowledge of fraud in the procurement of the patent. Such holding was reversed and the case remanded. 422 F.2d 1395 (8 Cir., 1970). The second time around the trial court

---

35. To the same effect see *Glen Manufacturing, Inc. v. Perfect Fit Industries, Inc.*, 299 F.Supp. 278, 284 (S.D.N.Y., 1969).

found overwhelming evidence of fraud on the Patent Office and the elements of a § 2 Sherman Act violation. 347 F. Supp. 376. In *Acme* the District Court found that the plaintiff had a dominant position in the relevant market. The Court of Appeals reversed *Acme II* on the ground "that the overall proof [was] grossly deficient in showing the extent of the relevant market and plaintiff's domination of it." 484 F.2d 1244.

The District Court considered the only issue whether or not the defendant suffered damage by reason of the monopolistic practices of the plaintiff. In that connection the Court said attorney fees for defending an infringement brought as a part of an illegal attempt to monopolize and to restrain trade "are properly assessible damages in an antitrust action for such attempt to monopolize," citing *American Infra-Red Radiant Co. v. Lambert Industries, Inc.*, 360 F.2d 977 (8 Cir., 1966). The defendant in *Acme* claimed substantial loss of sales due to the attempt to monopolize by the plaintiff. However, it was not proved that a decline in defendant's sales was due to the infringement suit. *Acme* is a case in which attorney fees in defending a patent infringement suit were the only "injury to business or property" proven in an antitrust counterclaim to a patent infringement suit defended on the ground that the patent was fraudulently procured.

In reversing, the Court of Appeals for the Eighth Circuit made no mention of the District Court's holding that attorney fees were assessible as damages. In view of its finding that there was no proof of the relevant market and dominance, the Court did not pass on the issue made by defendant's claim that the District Court erred in not awarding damages for lost sales. And, as to attorney fees, all the Court said was:

"... The finding that American Alloys is entitled to attorneys' fees under the Clayton Act is reversed; defendant is allowed attorneys' fees under 35 U.S.C. § 285 for the defense

of the infringement suit." 484 F.2d at 1244.

We do not view the apparent oversight of the Court of Appeals as weakening the District Court's holding about attorney fees being assessible as damages in an antitrust suit in a proper case because of the same Court's holding in *American Infra-Red, supra*, which will be discussed.

There are differences between the facts in *Acme* and the instant case. For instance, it is not shown that K&T threatened the entire industry as Acme did the aluminum industry, nor has it been shown that K&T advertised its patent as Acme did its patent. However, there can be no doubt that up to the point that the reissue claims were dropped from this lawsuit after discovery that Mr. Beall was employed in prosecuting the reissue application, defendants had to expend costs and attorney fees to defend themselves against plaintiff's monopolistic scheme and to this extent was injured in its business or property. Hence, we conclude as a matter of law that costs and expense are assessible as damages in the antitrust case. We conclude the matter is not one addressed to the Court's discretion.

The decision is important because it affects free access to the courts. Thus, in *Straus v. Victor Talking Machine Co., supra*, the antitrust counterclaim was rejected, because "[w]hen the suit of *Victor v. Straus* was brought, the most which can be said against Victor Company is that the questions litigated were debatable." 297 F. at 798. The Court noted that "free access to the courts must neither be denied nor penalized." This must be kept in mind in considering this issue.

This point was urged by Kobe in opposing the antitrust counterclaim against it. *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416. As to this the Court stated:

"... We fully recognize that free and unrestricted access to the

Courts should not be denied or imperiled in any manner. At the same time we must not permit the courts to be a vehicle for maintaining and carrying out an unlawful monopoly which has for its purpose the elimination and prevention of competition." 198 F.2d at 424.

In *Kobe* the trial court found the infringement action and incidental activities were intended and designed to further an existing monopolistic purpose.[36] 198 F.2d at 425. The Court of Appeals found the facts before it sufficient to support a finding that although Kobe believed some of its patents were infringed, the real purpose of the infringement action and the incidental activities of Kobe's representative was to further the existing monopoly and eliminate Dempsey as a competitor.

". . . The infringement action and the related activities, or course, in themselves were not unlawful, and standing alone would not be sufficient to sustain a claim for damages which they may have caused, but when considered with the entire monopolistic scheme which preceded them we think, as the trial court did, that they may be considered as having been done to give effect to the unlawful scheme."

The Court went on to note language from *American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575:

". . . Acts done to give effect to the conspiracy may be of themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition."

In *Clapper v. Original Tractor Cab Company*, 270 F.2d 616 (7 Cir., 1969), the Court held that a sum awarded for the defense of a patent infringement case as "exceptional" should have been included in the compensatory damages sustained by the defendant as the result of the antitrust violation which was the subject of a counterclaim.

In *Clapper* there were other items of damage besides attorney fees, namely, loss of sales, advertising costs rendered useless, expenses incurred in finance negotiation, and costs from a forced shut down, forced stoppage of production. Nevertheless, the cost of defending the litigation which was part of the monopolistic scheme was assessed as damages to be trebled. We fail to see any reason why such attorney fees and costs of defense prosecuted as part of a monopolistic scheme should be nonassessible because that is the only item of damage. We likewise consider *Kobe, supra*, as authority for the recovery threefold of the costs and expense of defending the infringement suit before the reissue claims were dropped.[37]

Next we note that as to *Dairy Foods*, the Court in *Malta, supra*, at 122, noted that on a motion to dismiss the Court assumed that the patentee brought suit for further unlawful monopolistic activities since the defendant in that case alleged in his counterclaim that he was forced either to cease competition, to compete under a discriminatory license, or to defend the patent litigation. It was in that context that the Court held that the defendant against whom a patent infringement suit is brought as part of and in furtherance of combination and conspiracy violating antitrust laws may recover threefold the costs and expense of defense, citing *Clapper* and *Kobe,* supra. The Court in *Dairy Foods* said:

". . . each of these cases is authority for the recovery of threefold

---

36. *Cf., Bendix Corp. v. Balax, Inc.,* 471 F.2d 149, 159 (7 Cir., 1972); *Prelin Industries v. G & G Crafts, Inc.,* 357 F.Supp. 52, 70 (W.D. Okl., 1972).

37. Defendants say its sales were not affected adversely because it contracted to indemnify customers from infringement claims. Plaintiff points out the defendant was required to do that under the Uniform Commercial Code and only did it in three instances.

the cost and expense of defending such an infringement suit." 297 F.2d at 809.

The Court also held that the counterclaim was not premature, saying:

". . . The injury to defendant's business or property occurred when plaintiff filed the infringement suit —the compulsion which forced the choice. Defendant's right of action, asserted by its counterclaim, then accrued." *Id.*, p. 809.

The Court also stated:

". . . A prior adjudication that claimed patent rights are unenforceable is not an element prerequisite to the maintenance of an antitrust action for damages or injunctive relief based on misuse of the patent." Id., at 809–10.

In *American Infra Red, supra,* the Court stated, at 996–7:

"As a second point defendants allege that the expense of defending the patent infringement segment of this litigation could serve as a basis for awarding treble damages and cite three cases in support of this theory. *Clapper v. Original Tractor Cab Company,* 270 F.2d 616 (7 Cir. 1959); *Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416 (10 Cir. 1952); *Dairy Food, Incorporated v. Dairy Maid Products Cooperative,* 297 F.2d 805 (7 Cir. 1961).

"In examining this contention we see that the statute, which affords the private cause of action, clearly requires a causal connection between the 'injury in his business or property' and the anti-trust violation. 15 U.S. C. § 15; *Royster Drive-In Theatres, Inc. v. American Broadcasting-Paramount Theatres, Inc.,* 268 F.2d 246 (2 Cir. 1959) cert. denied 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121. It follows, therefrom, that the expense of defending a patent infringement suit could not be considered as a per se element in determining treble damages in an anti-trust counterclaim. As

stated in the *Kobe* case, supra, cited by defendants in 198 F.2d at p. 425, '[I]f there was nothing more than the bringing of the infringement action, resulting damages could not be recovered. * * *' In order therefore to recover damages the law requires there be a showing of a causal connection between the infringement suit and the anti-trust activities. Upon a showing that the infringement litigation was initiated as part of the illegal scheme, it is conceivable that its defense could be considered as an 'injury' under the anti-trust statutes. This, in fact, is exactly what defendants' cases say. Patent litigation expense may only be considered in anti-trust counterclaims, 'Where an infringement suit is brought as part of and in furtherance of a combination and conspiracy * * *.' *Dairy Foods, Incorporated v. Dairy Maid Products Cooperative,* 297 F.2d 805, 809 (7 Cir. 1961). Therefore, whenever the patent litigation is initiated pursuant to a lawful purpose and there is no causal connection between the bringing of the action and the illegal conduct, the cost of the defense of the suit cannot become an element of damage which is tripled under the Clayton Act. See, *Malta Manufacturing Company v. Osten,* 215 F.Supp. 114 (E.D.Mich.1963)."

In the case before us, as we have said earlier, we have concluded that there was a "causal connection" between the bringing of the action and plaintiff's antitrust activities.

That concludes the discussion of the pertinent cases. The application of the principles enunciated therein to the facts of this case led to our conclusion stated at the outset of this discussion, namely, that attorney fees expended up to the time the reissue claims were abandoned by K&T were incurred because of the violation of § 2 of the Sherman Act (15 U.S.C. § 2), *i. e.,* there is impact or injury to business or property in the circumstances of this case. We

find there is a causal connection between the infringement suit and the antitrust activities.

We conclude, however, such "antitrust activities" did not include a violation of § 7 of the Clayton Act (15 U.S.C. § 18). On the contrary, like the Court in *Giddings & Lewis* we were satisfied with K&T's explanation of the acquisition by K&T of the Morgan patent and also its licensing practices.[38]

In *Kearney & Trecker Corp. v. Giddings & Lewis, Inc., supra,* at 600, the Court of Appeals reversed the District Court and remanded the case to the District Court with directions not only to enter judgment in favor of the defendant and to conduct additional proceedings on the counterclaim but to make "an appropriate award of attorneys' fees."

At page 597, the Court said:

"We agree that this is an exceptional case and that the recovery authorized by § 285 should be allowed. The factors which we consider of controlling importance are not the protracted and complex character of the litigation but rather the nature of plaintiff's wrongdoing and its potential impact on the public. [Citations omitted.]"

35 U.S.C. § 285 provides:

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."

On such authority this Court concludes an award of attorney fees for services after the reissue claims were dropped is appropriate.

## VI.

## SUMMARY

We conclude that the Brainard, *et al.*, patent is valid and infringed, though we only concern ourselves with the claims in suit and except claim 33. We conclude that the patent was not derived from Hughes and that there is no merit to defendant's contention that it is invalid for fraud on the Patent Office in withholding the most pertinent prior art or for any other reason. We conclude further that the plaintiff should not be collaterally estopped from bringing this action. We follow the majority in the decision of the Seventh Circuit in *Kearney & Trecker Corp. v. Giddings & Lewis, Inc., supra,* and hold that fraud on the Patent Office in connection with the reissue applications of Brainard, *et al.,* and Morgan requires the holding not only that the reissue claims are invalid, but that the original claims, such as those in suit, are unenforceable, though the Brainard claims in suit (except 33) are valid and infringed. Furthermore, there is an antitrust violation and liability to the defendant up to the point when the reissue claims were abandoned by the plaintiff. Finally, we conclude this is an appropriate case for attorney fees not assessed as damages, *i. e.,* fees incurred after the reissue claims were abandoned. The amount of damages and attorney fees is reserved.

As allowed by Rule 52, Fed.R.Civ.P., this opinion is intended to serve as the Court's findings of fact and conclusions of law. A judgment entry consistent therewith should be prepared and submitted for approval.

38. K&T satisfied this Court that its practice of requiring licensees to pay royalties on an entire machine even though the patented unit represented only about 10% of its costs was the same as that customarily used and approved in the trade. As to the acquisition of the Morgan patent, it should be noted that under the agreement K&T was bound to issue licenses to anybody and everybody and a percentage of the license fees went to IBM.

IBM had good reason to sell the machine because it was not in the machine tool business and K&T was. If K&T refused to license a customer, IBM reserved the right to do so itself. In sum, that analysis of the evidence led this Court to the conclusion that the antitrust violation resulted only from the abuse by K&T of the reissue privilege. There was no violation of § 7 of Clayton Act, 15 U.S.C. § 18.

It is hereby ordered, adjudged and decreed that:

1. The Court has jurisdiction of the parties and of the subject matter of this action and venue is properly laid in this District.

2. Plaintiff is and at all times has been the sole owner of Mark Morgan U. S. Patent No. Re. 25,812 and all rights thereunder, and was the total owner by assignment of Morgan Patent No. 2,901,927 since April 1, 1963, and prior to its surrender to the Patent Office.

3. Plaintiff is and at all times has been the sole owner of Wallace E. Brainard, et al., U. S. Patent No. Re. Re. 25,737 and all rights thereunder, and was at all times total owner of Patent No. Re. 25,583 and Patent No. 3,052,011 prior to their surrender to the Patent Office.

4. Plaintiff is and at all times has been the sole owner of Wallace E. Brainard, et al., U. S. Patent No. 3,099,873 and all rights thereunder.

5. The complaint is dismissed.

6. Claim 10 of Morgan Patent Re. 25,812 is invalid and unenforceable.

7. Original claims 1–20 of Morgan Patent Re. 25,812 are unenforceable.

8. Reissue Claims 21–31 of Morgan Patent Re. 25,812 are invalid, void, and unenforceable.

9. Claims 19, 20, 21 and 24 of Brainard, et al. Patent Re. Re. 25,737 are unenforceable, but said claims were valid under 35 U.S.C. § 102 and 35 U.S.C. § 103 as originally issued in Patent 3,052,011.

10. Original claims 1–35 of Brainard, et al., Patent Re. Re. 25,737 are unenforceable.

11. Claim 33 of Brainard, et al., Patent Re. Re. 25,737 is unenforceable, but, in any event, it is not infringed.

12. Reissue claims 36–60 of Brainard, et al., Patent Re. Re. 25,737 are invalid, void, and unenforceable.

13. Claims 19, 20, and 24 of Brainard, et al., Patent Re. Re. 25,737 would be infringed by defendants' ATC automatic tool changer machines and defendants' Cim-Xchanger automatic tool changer machines if they had not been rendered unenforceable.

14. Plaintiff has attempted to restrain and monopolize interstate trade and commerce in multi-function machine tools with automatic tool changers in violation of § 2 of the Sherman Act (15 U.S.C. § 2) in the prosecution and exploitation of Morgan Patent Re. 25,812 and Brainard, et al., Patent Re. 25,583 and Re. Re. 25,737.

15. Defendants have been injured in their business or property by reason of plaintiff's violation of § 2 of the Sherman Act, and defendants are entitled as a matter of law to an award of treble damages pursuant to § 4 of the Clayton Act (15 U.S.C. § 15) limited to threefold the costs, expenses, and reasonable attorneys' fees incurred in their defense of this action up to the point in time when the reissue claims 36–60 of Brainard, et al., Patent Re. Re. 25,737 were abandoned by the plaintiff. The amount of damages is reserved for later determination by the Court.

16. This is an exceptional case under 35 U.S.C. § 285, and the defendants are entitled to an award of reasonable attorneys' fees incurred in their defense of this action and in the prosecution of their counterclaims commencing with the point in time when the reissue claims 36–60 of Brainard, et al., Patent Re. Re. 25,737 were abandoned by the plaintiff. The amount of attorneys' fees is reserved for later determination by the Court.

17. Defendants, the prevailing parties, would ordinarily be entitled as a matter of course to their costs in defending this action and prosecuting their counterclaim, unless otherwise ordered. Rule 54(d) Fed.R.Civ.P. Since the costs are to be the subject of an accounting for damages under ¶ 15 above, up to the point when the Brainard reissue claims were abandoned, and since attorney fees (for services after abandonment of the Brainard reissue claims)

have been awarded because this is an exceptional case (¶ 16), the Court deems it appropriate to direct and it is therefore ordered that each party pay their own costs, without prejudice to defendants including such costs in their claim for damages to be trebled.

18. The counterclaim for a declaration of invalidity of all the claims of Patent Re. 25,812, Patent Re. Re. 25,737, and Patent 3,099,873 is dismissed as no justiciable issue is presented in view of such claims being void and/or unenforceable.

19. The counterclaim for relief under § 7 of the Clayton Act (15 U.S.C. § 18) is dismissed.

It is so ordered.